IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 24, 2008

## STATE OF TENNESSEE v. MICHAEL E. STEWART

**Appeal from the Criminal Court for Polk County**
**No. 02-180     Carroll L. Ross, Judge**

**No. E2007-00841-CCA-R3-CD - Filed May 13, 2009**

The defendant, Michael E. Stewart, appeals as of right from his convictions by a Polk County jury of first degree premeditated murder, first degree felony murder in the perpetration of kidnapping, kidnapping, a Class C felony, and tampering with evidence, a Class C felony. The murder convictions were merged, and the defendant was sentenced to life and to eight years for the two Class C felonies, which are to be served concurrently to each other but consecutively to the life sentence, for an effective sentence of life plus eight years. The defendant contends that the evidence is insufficient to support the felony murder and kidnapping convictions and that the trial court erred in admitting evidence that the defendant was taken into custody on outstanding warrants from other charges. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

John E. Herbison, Nashville, Tennessee (on appeal); and Jerry Hoffer, Cleveland, Tennessee (at trial), for the appellant, Michael E. Stewart.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Robert Steve Bebb, District Attorney General; and Matthew Dunn and Shari Tayloe Young, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case involves the death of Willard Trentham. The victim died from injuries he sustained in beatings by the defendant.

Detective Joe Price of the Polk County Sheriff's Department testified that he was working as a patrol officer around 11:00 p.m. on July 20, 2002, when he was dispatched to the Ladd Springs area regarding a possible fight. He said that it took him about fifteen to twenty minutes to arrive and that although no one was present when he reached the location, he found a shoe, some loose change,

and what appeared to be blood on the road.  He said he received a dispatch at 12:30 a.m. on July 21 to go to the home of Paul and Wanda Stewart regarding a possible death.  He said that when he arrived, Officer Epperson was already there and directed him to the back seat of a red Chevy Corsica parked in the driveway.  He said the victim was dead on the back seat.  He said that the defendant, Wanda Stewart, and Samantha Bivens were present and that the defendant was placed in custody on the basis of some outstanding warrants.  He said that as he and Officer Epperson were securing the scene, he saw a shoe on the front porch that was the mate to the one he had seen earlier when he responded to the fight call on Ladd Springs Road.  He said the victim was not wearing shoes.  He identified two shoes as the one he found at the scene of the fight call and the one he found at the Stewart residence.

Brad Stamey testified that he was a friend of the defendant.  He said that on July 20, he had just been released on parole and snuck across the Tennessee-Georgia state line to visit his parents, Kenneth and Sue Stamey, who were camping.  He said the victim, Donnie Payne, Junior Swinford, and Diane Trentham were at the campsite, as well.  He said the defendant and the defendant's girlfriend Samantha arrived around dusk and stayed for about two or three hours.  He said the defendant was not his usual self and "had an attitude" and was "outgoing about everything."  He said that the defendant had wrecked his car by sliding off a bank and that the defendant and Samantha were brought to the campsite by someone who gave them a ride.  He said the defendant's car was later removed by a tow truck and brought to the campsite.  He said the defendant and the victim were talking, hugging, and interacting normally.  He said that people were drinking alcohol but that he was not one of them.  He acknowledged having said in his preliminary hearing testimony that he had been drinking but explained that he misunderstood the question.  He said the victim was intoxicated and that the defendant was drinking but not intoxicated.  He said the victim left the campsite about fifteen minutes before the defendant.

Mr. Stamey testified that a short time later, he, his father, and Donnie Payne left to purchase beer and cigarettes at a Golden Gallon store.  He said that as they came around a curve, he saw the defendant parked on the side of the road and the victim's car with steam coming out of it.  He said there was damage to the rear bumper of the defendant's car and the muffler was dragging.  He said that the victim sped away and that the defendant pounded the top of his car, screamed, "I'm going to kill that son-of-a-b----," and followed the victim.

Mr. Stamey testified that he continued driving and came upon the victim and the defendant a second time at a four-way stop.  He said the defendant was pulling at the window and door of the victim's car, picked the victim up out of the car, and slapped him with an open hand "no more than three times."  He said the victim's head hit the bumper of one of the cars.   He also described the victim as sitting on the ground bleeding.  He said he got out of his car and told the defendant not to hit the victim anymore.  He said the defendant stated, "Somebody's going to pay me for that g------ car, boy."  He said he tried to calm the defendant.  He said he never heard the defendant tell the victim he was going to kill the victim.

Mr. Stamey testified that he took the victim from this location in the victim's car.  He said that he wanted to take the victim for medical attention.  He described the victim as being in "bad shape" with blood coming from his ears, mouth, and nose, his eyes swollen, and making a gurgling

sound. He said the victim was trying to tell him to go to the victim's daughter's house, but Mr. Stamey did not know where it was. He said that the victim's car was not running well and that he decided to stop at the house of Wanda Stewart, the defendant's mother, to use the telephone to call for an ambulance. He said, however, he was not permitted to use Mrs. Stewart's telephone. He said that while he was at the door trying to get permission to use the telephone, the defendant drove up, removed the victim from the car, and began "roughing him up again."

Mr. Stamey testified that the defendant's father Paul intervened to get the defendant away from the victim. He said that after the defendant became calm, the defendant took the victim to the porch and sponged his face. He said that he was scared because he was on parole and in Tennessee illegally, and that he wanted the defendant and Samantha to drop him at his parents' campsite and take the victim for medical care. He said that they, however, did not realize the severity of the victim's situation. He said that when they reached the campsite, the victim's breathing was shallow, he started gurgling more, and his eyes were rolled to the back of his head. He said they got him out of the car and tried to give him mouth-to-mouth resuscitation. He said that he was unaware of anyone at the campsite having a cellular telephone. He said that the victim was placed back into the car and that Samantha drove away with him. He said the defendant, who at first planned to remain at the campsite, ran after the car to go with Samantha and the victim. He said that before the defendant left, the defendant said, "Oh, God, what can I do? What am I gonna do?" He said the defendant also made a statement that he "didn't give a f--- if [the victim] died or not."

Mr. Stamey testified that his parents took him home that evening. He said they did not call to see whether the victim had been taken to the hospital and assumed that the defendant and Samantha had done so.

Donnie Payne testified that his wife was Brad Stamey's sister. He said that he was at the campsite on the night of July 20 when the defendant and the victim were present. He said the defendant was doing "crazy things" and acting as if he were on drugs. He said the defendant was trying to pick fights.

Mr. Payne testified that the defendant left the campground about 7:30 p.m. and that the victim left between thirty minutes and an hour later. He said he went that evening with the group to buy cigarettes. He testified that he drove and denied that he was trying to protect Brad Stamey by saying that he drove. He said that on the drive, he saw headlights from two cars coming toward him and that he pulled to the side of the road. He said one of the cars was the victim's, which the defendant was "butting the side of . . . trying to knock [the victim] off the road." He said the defendant dragged the victim out of his car by his hair and began beating him with his fists. He said he saw the defendant land at least ten to twenty punches to the victim's head, neck, and chest. He said the victim ended up on the ground, and he said he saw the defendant kick and stomp the victim a time or two on the chest and ram the victim's head into a car bumper. He said that he never saw the victim try to hit the defendant or try to block the blows and that the victim was trying to get away from the defendant. He said the defendant was mad, cursed, made statements about the victim hitting his car, and told the victim he would kill him. He described the victim as large but old and unable to hold his own against the defendant. He said that the victim was rendered helpless and that the victim's face was covered in blood. He said Brad Stamey had intervened during the beating but

-3-

that the defendant slung Mr. Stamey away. He said that this was the only altercation he saw between the defendant and the victim and that he had not seen the defendant beating on the roof of a car.

Mr. Payne testified that two or three people stayed with the victim after the beating. He said he returned to the campsite. He said he did not see the defendant that night at the campsite. He said "they" brought the victim to the campsite and dumped him on the ground the next day. He said the victim was dead. He said he did not see the defendant when the victim was brought back to the campsite.

Mr. Payne acknowledged that he had poor vision in one of his eyes since having a stroke in July 2004. He also acknowledged that he could not see well at night. He said he had been a friend of the victim's for forty to forty-five years.

Mr. Payne testified that he was not drinking on the day of the incident but that he could smell alcohol on Brad Stamey, although he never saw Mr. Stamey drinking. He said he did not think Kenneth Stamey was drinking.

Kenneth Stamey testified that the defendant was his step-grandson whom he had helped raise. He said that on July 20, he and his wife were camping with several other people on Sand Creek. He said the defendant arrived around 3:00 or 4:00 p.m. with Samantha. He said that the defendant had driven into a ditch but that someone with a tow truck had pulled the car out of the ditch. He said the defendant was drinking beer but was not violent. He also said the victim was drinking and was intoxicated. He said there was no disagreement between the victim and the defendant at the campsite. He said the defendant left before he left with Brad Stamey and Donnie Payne to get beer. He said that he and his son did the driving and that Mr. Payne did not drive on this trip.

Mr. Stamey testified that on the way, they saw the defendant beating on his car because the victim had run into the defendant's car, although they did not see the wreck happen. He said the defendant said, "I'll beat the h--- out of that son-of-a-b----." He said that they followed the defendant and the victim and that at another location, Brad Stamey jumped out of the car and tried to talk the defendant out of hitting the victim, to no avail. He said that the defendant was mad because his car had been hit and that he was hitting the victim and saying he did not care if he killed the victim. He said that the victim fell to the ground while the defendant was assaulting him and that the victim tried to get up. He said he did not see the defendant kick the victim. He said that he did not see the defendant ram the victim's head into a car bumper but that he heard a loud thud. He said that after the altercation was over, the defendant and Brad had to put the victim into the victim's car, that Brad stayed behind to take the victim for medical assistance, and that the rest of his group went back to the campsite.

Mr. Stamey testified that later that evening, the defendant returned to the campground with the victim. He described the victim as "kind of blue around the mouth" but not looking "like he was beat or to pieces or nothing, or beat up bad or nothing." He said, however, the victim was unconscious and breathing "real low." He said his wife attempted to give the victim CPR but was unsuccessful. He also said he thought that Samantha was going to take the victim to the hospital but that he understood she had not. He said the defendant was upset and crying and wanted the victim

to be taken to the hospital but also made the statement, "They'll give me 20 years." He said no one at the campsite had a cellular telephone. He said he left to take his son back to Georgia.

Hazel "Sue" Stamey testified that the defendant was her grandson and that Brad Stamey and Kenneth Stamey were her son and husband, respectively. She said she was camping on July 20, 2002. She said the defendant visited them at the campsite and was drinking beer and acting as if he were "on pills." She said he was "happy-go-lucky." She said the defendant left the campsite about 3:00 or 4:00 p.m. She described the victim as "drunk" by this point and said he left thirty minutes to an hour after the defendant, after saying he was going to visit his daughter.

Ms. Stamey testified that later that evening, the defendant, Samantha, and Brad Stamey brought the victim to the campsite. She said that she attempted CPR but that the victim needed medical treatment. She said that the victim's face was blue but that he was not bleeding. She did not know whether the victim was breathing. She said that she was unable to help the victim, that she was scared, and that she said the victim needed to go to the hospital. She said she made a statement to the defendant, "You ought to be ashamed," and that the defendant responded that he did not give a d---.

Ms. Stamey testified that it was possible the defendant was upset and crying after he returned to the campsite with the victim. However, she said she did not recall that having happened.

David Guy testified that he was the assistant special agent in charge of the East Tennessee District of the Tennessee Bureau of Investigation (TBI) and that he was called to a crime scene at a residence on July 21 at 12:40 a.m. He said that when he arrived, there was a person lying in the back seat of a Corsica car and that the person had experienced extreme blunt trauma from the neck to the top of the head. Using photographic exhibits, Agent Guy described the victim's injuries.

Agent Guy testified that due to the size of the crime scene and the number of items of evidence he saw, he called the violent crime response team to process the residential scene. He said the violent crime response team also processed the two roadside scenes but did not process the campsite. He said that at one of the roadside scenes, parts of vehicles were recovered and that at the other, coins, blood, and a shoe were found. He said a shoe which matched the one found on the roadside was recovered on the front deck at the residential scene. He said he went to the campsite and recovered a blanket from Mrs. Stamey.

Using a photograph, Agent Guy described damage to a gray Oldsmobile, which he said belonged to the victim. He said that the damage consisted of a broken taillight lens and that the pieces were on the ground beneath the car in the photograph. He said this meant the damage occurred at that location. He also described damage to the front of the car, consisting of old damage for which there was no debris at the scene, and new damage with parts at the scene.

Agent Guy also identified a photograph of a red Neon, which he said belonged to the defendant. He said the Neon did not have front-end damage. He said another photograph depicted slight damage to the rear bumper of the Neon.

Agent Guy testified that there were other vehicles at the residential crime scene. He said that one of them, a red Chevrolet, had damage which appeared to have occurred at that location. He based this conclusion on debris that was present.

Agent Guy testified that EMS workers had been on the scene before he arrived. He did not know what procedures they performed on the victim.

Agent Guy testified that in his experience, it was possible for two cars to collide and the damage to one to be much greater than to the other. He offered his opinion that it was possible the victim's car hit the back of the defendant's car despite the varying amount of damage to the two cars.

TBI Agent Shelly Betts testified that she was a forensic scientist assigned to the firearms identification unit of the TBI Laboratory and was a member of the violent crime response team. She was allowed to testify as an expert in forensics. She stated that she went to the residential crime scene. She said there were four vehicles, one of which had a transmission fluid trail leading from the end of the driveway. She said there were numerous broken car pieces around the cars and blood spatter on the gravel. She reported that there appeared to be a drag mark from behind a red Neon to a maroon Corsica and that the victim's body was in the back seat of the Corsica.

Agent Betts identified sketches of the scene which reflected the location where evidence was recovered. She also identified photographs taken at the scene. Using these exhibits, which reflected the scene both inside and outside the residence, she testified about the location of the evidentiary items collected and identified them. She noted that broken pieces of red plastic were on the ground behind the Oldsmobile and that what appeared to be blood was in numerous places, both inside and outside the house.

Hunter Greene, a Special Agent Forensic Scientist with the TBI, testified as an expert witness in serology and latent print examination. He stated that he compared known blood samples from the defendant and the victim with evidence collected. He said that blood that DNA testing could not exclude as having come from the victim, but that was also not the defendant's blood, was found on a pair of shorts and sections of linoleum that were removed from the residence. He determined that the victim's DNA was present in blood on paper towels collected from a trash can in the living room. He said that based upon its pattern on the paper towels, the blood appeared to have been wiped onto the towels. He said the victim's blood was also on a t-shirt from a trash can in the laundry room. He determined through DNA testing that the victim's blood was also collected from the deck and the ground between the Oldsmobile and the Neon and from the upholstery in the back seat of the Oldsmobile. He said human blood was present on a sandal from the laundry room floor, an athletic shoe from the laundry room, a shoe from the deck of the residence, and two shoes from Wanda Stewart, but he did not perform testing to identify the source due to the small quantity of blood. He determined that human blood had been collected from the door area of the home but that DNA testing was inconclusive. For another sample collected from the door area, he determined that the sample contained blood and the victim's DNA. He said test results revealed that human DNA and blood were on a mop from the kitchen, but he said he was not able to get a DNA profile due to the condition of the sample. He said human blood was also present on the back bumper of the Oldsmobile.

Agent Greene testified that a sample taken from one of the roadside crime scenes contained blood and the victim's DNA. He said a blanket from the campsite contained human blood but that he was unable to identify any DNA.

Agent David Guy was recalled by the State and testified that he first saw the defendant on the afternoon of July 21, the day after he responded to the crime scene. He said he looked for injuries on the defendant and saw none. He said the defendant reported that his big toe was sore but that the toe did not appear to be injured. He said the defendant did not appear to be impaired. He said he also observed Samantha Bivens, Brad Stamey, and Kenneth Stamey, none of whom appeared to have any injuries.

Dr. Amy McMaster testified as an expert in forensic pathology about her autopsy of the victim. She said the victim appeared older than the reported age of sixty-five and had numerous and significant injuries to his head and neck, including contusions, abrasions, and lacerations. She also observed bleeding of the brain. She said that due to the number and extent of the injuries, significant force from multiple blows were involved. She said the victim also had fractures of the thyroid cartilage and hyoid bone, both structures in the neck, which could be caused by strangulation or significant blunt trauma. She said the thyroid cartilage fracture could be caused from stomping the neck and that gurgling could be consistent with a person having this type of injury. Dr. McMaster stated that the victim had multiple bruises on his chest and back, multiple linear and round scratches on his back and left hip, and a brush burn type abrasion on his back. She said the bruises on the victim's torso were not consistent with resuscitation efforts. She said that the victim's arms, legs, and right foot were bruised and that the bruises were consistent with stomping injuries.

Dr. McMaster testified that a sample of the victim's blood showed a .212 percent ethanol level. A second sample taken from the victim's subdural hematoma showed a .307 percent ethanol level. She said he had salicylate, also known as aspirin, in his blood, as well. In Dr. McMaster's opinion, the higher subdural ethanol level meant that the victim probably had not died immediately after his head injury. She said that the victim had several potentially fatal injuries which combined to cause his death. She said the cause of death was blunt force trauma. She acknowledged that it was possible for a person to be bruised from excessively forceful resuscitation efforts. She excluded alcohol as a factor in the victim's death.

The defendant did not offer any evidence. The jury found the defendant guilty of first degree premeditated murder, first degree felony murder in the perpetration of kidnapping, kidnapping, and tampering with evidence. The trial court imposed a life sentence for the murder counts, eight years as a Range II offender for kidnapping, and eight years as a Range II offender for tampering with evidence. The eight-year sentences were imposed concurrently with each other but consecutively to the life sentence, yielding an effective sentence of life plus eight years.

## I

On appeal, the defendant raises two challenges to the sufficiency of the convicting evidence. He argues that the proof was insufficient to support the convictions of both kidnapping and felony murder in the perpetration of kidnapping. He contends that the evidence fails to demonstrate that

he moved the victim more than minimally, as was incidental to his assault of the victim, and that as a result, double jeopardy prevents him from being convicted of the kidnapping-related offenses. With regard to the felony murder conviction, the defendant argues alternatively that even if this court holds that the evidence was sufficient to support the kidnapping conviction, there is no evidence the defendant formed the intent to commit kidnapping before or at the time of his assault on the victim. The State argues that the evidence is sufficient and that double jeopardy is not offended by the convictions.

## A. Kidnapping

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

As relevant here, "[k]idnapping is false imprisonment . . . [u]nder circumstances exposing the other person to substantial risk of bodily injury[.]" T.C.A. § 39-13-303(a)(1) (2006). False imprisonment is the knowing and unlawful removal or confinement of a person so as to interfere substantially with the person's liberty. Id., § 39-13-302.

The defendant's allegation in this case is that the evidence viewed in the light most favorable to the State does not show that the defendant committed a separate kidnapping aside from his assault necessary to commit the homicide. Our supreme court has said that separate offenses of kidnapping and another offense may violate due process if the kidnapping was essentially incidental to the commission of the other offense. State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). In determining whether due process allows separate convictions, a court must consider first whether the movement or confinement involved in the kidnapping "was beyond that necessary to consummate the accompanying crime." State v. Richardson, 251 S.W.3d 438, 442 (Tenn. 2008); see State v. Dixon, 957 S.W.2d 532, 535 (Tenn. 1997). If so, the court must then examine "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Dixon, 957 S.W.2d at 535; see Richardson, 251 S.W.3d at 443.

We first note Anthony's due process analysis was deemed to apply only when the commission of the primary offense necessarily involved a kidnapping under Tennessee law. In this regard, we conclude that the commission of premeditated or felony murder does not necessarily include a kidnapping.

Relative to this case, the evidence shows the following acts of movement or confinement of the victim by the defendant: (1) between the first and second roadside scenes, the defendant hit the victim's car in an effort to force him to stop, (2) after forcing the victim to stop, the defendant pulled

-8-

the victim from his car and savagely beat him into unconsciousness and continued assaulting him after he was rendered unconscious, (3) at the residential scene, he interfered in Brad Stamey's efforts to get the victim medical attention by removing the victim from the car and resuming his violent assault on him, despite the fact that the victim was already in "bad shape," was bleeding, swollen, and making gurgling sounds, (4) the defendant and Samantha Bivens took the victim and Brad Stamey to the campsite, despite the fact that the victim was critically wounded and needed medical care, rather than calling an ambulance from the Stewart residence or taking him directly to a medical facility, and (5) after having made the statement that he did not care whether the victim died, the defendant ran after Ms. Bivens when she was leaving the campground to take the victim for medical care, got in the car, and they took the victim back to the Stewart residence. Viewed in their totality, we hold that these actions constitute movement or confinement which was beyond that necessary for the defendant to consummate the homicide.

Under the second part of the Dixon inquiry, the defendant's actions, particularly his taking the victim from the Stewart residence to the mountaintop campsite and taking him from the campsite back to the Stewart residence, prevented the victim from summoning help. The evidence demonstrated that the victim was in grave condition from the defendant's beatings, yet the defendant and Ms. Bivens did not seek medical care for the victim but instead took him to a remote location in order to drop off Brad Stamey. Ms. Bivens then left with the victim, still alive but in poor condition, to obtain medical care. However, the defendant intervened, and they returned instead to the Stewart residence, where the victim was found dead by the authorities. The defendant's interference with the efforts of Brad Stamey and Samantha Bivens to obtain medical assistance for the victim lessened the defendant's risk of detection. The defendant created a significant danger and increased the victim's risk of harm by removing him from the car and committing a second assault at the Stewart residence when Mr. Stamey was attempting to obtain medical care for the victim, by taking the victim to the campsite, and by interfering with Ms. Bivens' effort to take the victim for medical assistance and instead returning the victim to the Stewart residence. We hold that due process does not prohibit dual convictions of kidnapping and first degree murder.

In addition, we hold that the evidence is sufficient to support the kidnapping conviction. Viewed in the light most favorable to the State, the evidence demonstrates that the defendant knowingly removed and confined the victim in a manner that substantially interfered with his liberty and exposed the victim to substantial risk of bodily injury.

### B. Felony Murder in Perpetration of Kidnapping

The defendant argues first, with respect to the felony murder conviction, that due process prevents the kidnapping conviction, and therefore prevents a conviction of felony murder in perpetration of kidnapping, as well. For the reasons stated above, this argument is without merit.

The defendant argues alternatively that the evidence does not show that the defendant formed the intent to commit the kidnapping before or concurrently with the administration of the fatal blows. His argument is based upon State v. Thacker, in which our supreme court observed

The felony murder rule applies when the killing is "done in pursuance of the unlawful act, and not collateral to it." Farmer v. State, 201 Tenn. 107, 296 S.W.2d 879, 883 (1956). "The killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it." Id. (quoting Wharton on Homicide, § 126 (3rd ed.)). The killing "may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999). Nevertheless, the "intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." Id. at 107. "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id. at 108.

164 S.W.3d 208, 223 (Tenn. 2005). In the present case, the defendant's repeated acts of restraining or confining the defendant in order to commit two assaults at two locations and then keeping the victim under his control and away from medical assistance after having administered these severe beatings are evidence from which a rational jury could infer that the defendant formed the intent to commit kidnapping before or during the homicide. We hold that the evidence is sufficient to support the felony murder conviction.

## II

The defendant argues that the trial court erred in allowing Detective Price to testify that the defendant was taken into custody on outstanding warrants. He contends that the evidence invited the jury to speculate about the subject of the outstanding warrants, suggested the defendant's involvement in other criminal activity, and violated the non-testifying defendant's right to a fair trial by admitting evidence of the defendant's criminal history. The State argues that the defendant waived this issue by failing to raise it in his motion for new trial.

The record reflects that although the defendant objected at the trial, he did not raise the issue in the motion for new trial. Appellate consideration of the issue is waived pursuant to Tennessee Rule of Appellate Procedure 3(e). Thus, the defendant is not entitled to relief unless the issue rises to the level of plain error. See T.R.A.P. 36(a); Tenn. R. Crim. P. 52(b); State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000). In this regard, we conclude that plain error does not exist.

The defendant has not identified a clear and unequivocal rule that has been breached. While he is correct that a defendant is entitled to a fair trial, he argues only generally that the jury's knowledge of his outstanding warrants prejudiced him because it implied a criminal history. However, there was no evidence of the nature of the charges, and mention of the warrants was made only briefly when Detective Price described what was done when the authorities arrived at the Stewart residence. The defendant did not employ an identity defense at trial, such that information

-10-

that he had a criminal past might be misused by the jury to infer his identity as the perpetrator of the present crimes.  Consideration of this issue is not necessary to do substantial justice.  The defendant is not entitled to plain error relief.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____

JOSEPH M. TIPTON, PRESIDING JUDGE