IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 25, 2009 Session

## STATE OF TENNESSEE v. LANDY M. CLEMMONS

**Appeal from the Criminal Court for Knox County**
**No. 86717      Richard R. Baumgartner, Judge**

---

**No. E2008-01326-CCA-R3-CD - Filed October 12, 2009**

---

The Defendant, Landy M. Clemmons, appeals his convictions by a jury in the Criminal Court for Knox County for two counts of aggravated burglary, a Class C felony, and two counts of aggravated kidnapping, a Class B felony. The trial court merged the two aggravated burglary convictions and sentenced the Defendant to nine years as a Range II, multiple offender for the aggravated burglary and to eleven years as a Range I, violent offender for each of the aggravated kidnappings, to be served concurrently, for an effective eleven-year sentence. On appeal, the Defendant contends that his convictions for both aggravated burglary and aggravated kidnapping violate principles of due process. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Joshua D. Hedrick, Knoxville, Tennessee, for the appellant, Landy M. Clemmons.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Randall E. Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the Defendant's burglary of Elizabeth and James Kelley's home and the kidnapping of two house painters. Ms. Kelley was the Defendant's former sister-in-law. At the trial, the Defendant and the State stipulated that the Defendant left a voice-mail message for Ms. Kelley on November 14, 2006, the day before the burglary, in which he stated he had acquired a gun.

Joseph Ratti testified that he was a construction worker and had known Elizabeth and James Kelley for approximately five years. He said he had worked for the Kelleys on several occasions cutting down trees, repairing their deck, and painting the interior and exterior of their home. He said

he and his former brother-in-law, Jeff Harrison, were working for Ms. Kelley on November 14, 2006. He said he received a telephone call from her that night and she was "very shaken up."

Joseph Ratti testified that on November 15, 2006, he arrived at Ms. Kelley's house at approximately four o'clock in the afternoon. He said he was working in Ms. Kelley's master bathroom and heard someone or something hitting the trash cans outside. He said he assumed it was an elderly driver who had gotten stuck because the Kelleys' house was on a tight cul-de-sac and it sometimes happened. He went downstairs to see if he could help. He said that when he got into the hallway leading to the front door, the Defendant was coming through it. He said the Defendant asked, "Who the f---- are you?" and he replied, "I'm Joe. I'm the painter." He said the Defendant asked the whereabouts of Mr. and Ms. Kelley and he replied they were at work. He said the Defendant stated he was there to kill Mr. and Ms. Kelley. He said the Defendant told him that the Defendant would kill him if he moved. He said the Defendant pointed a gun at his chest. He described the gun as a nickel- or silver-colored revolver. He said the Defendant repeated several times that he was there to kill Mr. and Ms. Kelley. He said the Defendant told him several times that if he moved the Defendant would kill him.

Mr. Ratti testified that the Defendant appeared nervous. He said the Defendant yelled for Mr. and Ms. Kelley. He said that after two or three minutes, Jeff Harrison arrived. He said that when the Defendant saw Mr. Harrison approach, the Defendant had him move so that his back was to the front door. He said he was holding his arms up in the air but that the Defendant put the gun behind the Defendant's back. He said the Defendant did not want Mr. Harrison to see the gun. He said that when Mr. Harrison entered the house, the Defendant told Mr. Harrison that the Defendant had a gun. He said the Defendant told Mr. Harrison to move next to Mr. Ratti and then not to move or the Defendant would kill him. He said the Defendant stated he was there "to take care of" the Kelleys. He said the Defendant next told him and Mr. Harrison to move into the parlor or the Defendant would kill them. He said he and Mr. Harrison moved into the parlor.

Mr. Ratti testified that he and Mr. Harrison tried to convince the Defendant that Ms. Kelley was not at home. He said the Defendant backed toward the stairs and said, "Ya'll move, I'll hear you and I'll kill you." He said that as soon as he and Mr. Harrison heard the Defendant climb about halfway up the stairs, they ran out the front door.

Mr. Ratti testified that he saw another car parked in the driveway blocking his van. He said he and Mr. Harrison got into Mr. Harrison's truck and left the subdivision. He said he called the police while Mr. Harrison called Ms. Kelley. He said that a few minutes later they saw the Defendant's car, and that they followed the Defendant and informed the police of the Defendant's route.

On cross-examination, Mr. Ratti conceded that although he stated on the 9-1-1 tape that the Defendant had kicked in the door, he had just assumed that was how the Defendant entered the Kelleys' home. He said the Kelleys' front door was wood on a wood frame and that it had been locked. He agreed that he heard the trash cans but not someone kicking in the door. He said he did not recognize the Defendant when the Defendant entered the Kelleys' home. He said that when he asked the Defendant to identify himself, the Defendant replied, "I'm Landy." He said that Mr.

Harrison arrived approximately five minutes after the Defendant. He said the Defendant put the gun behind the Defendant's back as Mr. Harrison was walking up to the house. He agreed the Defendant did not push him but touched him on the shoulder. He described the parlor as a ten-foot by twelve-foot room with one other exit.

Mr. Ratti agreed that after he and Mr. Harrison left the Kelleys', they saw a car they believed belonged to the Defendant and tried to catch up to it. He said he and Mr. Harrison wanted to provide the license plate number to the police. He acknowledged that the 9-1-1 operator suggested that he and Mr. Harrison stop following the Defendant's car and that they stopped.

Jeffrey Harrison testified that he worked in the construction business with his ex-brother-in-law, Joseph Ratti. He stated he had known Mr. and Ms. Kelley for close to three years. He said he was supposed to help Mr. Ratti paint and hang big pictures at the Kelleys' house on November 15, 2006. He said he usually parked in the driveway but on that afternoon the driveway was blocked by a blue car backed into the driveway. He said he noticed the front door was open. He said he saw Mr. Ratti with his back to the door and his hands in the air as if he were waving. He said he saw the Defendant standing opposite Mr. Ratti, facing the front door. He said he entered the house. He said that the Defendant had one hand behind his back. He said the Defendant asked, "Who the hell are you?" and he responded that he was Mr. Ratti's brother. He said the Defendant appeared "edgy" and "maybe a little upset."

Mr. Harrison testified the Defendant told them to get into the parlor and not to move. He said that although the Defendant said he had a gun, he did not see it. He said the Defendant stated, "Don't move. Stay in there. Don't move or I'll kill you." He said that once the Defendant reached the stairs, he and Mr. Ratti ran from the house to his truck. He said that after he had driven out of the subdivision, he turned the truck around and soon after saw the Defendant's car leave the subdivision. He said that after he talked to Ms. Kelley and knew the police were on their way, he and Mr. Ratti decided it was safe to return to the Kelleys' house.

On cross-examination, Mr. Harrison stated that approximately three or four minutes passed from the time he arrived at the house until the time he was told to move into the parlor. He acknowledged that the Defendant left the parlor and went into the rest of the house, yelling for Ms. Kelley. He conceded that he had been convicted of ten counts of burglary.

Elizabeth Ann Kelley testified that she had lived in her present home in Knoxville for twelve and a half years. She said her husband did not live with her. She said her husband lived in Oklahoma City, Oklahoma, where he taught air traffic control at the FAA flight academy. She said her husband came home about every four to five months. She said she knew the Defendant and that he had been married to her sister. She said the Defendant and her sister had been divorced for almost eight years. She said she had worked for eleven years at Lakeshore Mental Health Institute in the acute male psychiatric unit as a nurse clinician and program coordinator.

Ms. Kelley testified that before November 15, 2006, she had not talked to the Defendant for several months. She said that sometime during the summer of 2006, the Defendant had telephoned her home at approximately three o'clock in the morning. She said that her husband had answered

the telephone and that the Defendant had stated only that he was getting ready to walk his dog. She said her husband told the Defendant that he should go walk the dog and not call their house at such hours. She said that she did not socialize with the Defendant, that he had not been a guest in her home since he was divorced from her sister, but that she did see him periodically at graduations and funerals.

Ms. Kelley testified that on November 14, 2006, she returned home from work to find a voice-mail message from the Defendant. She acknowledged that part of the message was, "And, you know, you always say, 'pick your ass up and carry on,' well . . . that's easier said than done, Elizabeth, you know. So I went out and – let me put my glasses on here – and got me a .44 Magnum." She acknowledged that at the end of the message she heard the sound of a gun being fired. She said she called her sister, the Defendant's ex-wife. She said she called the police to conduct a welfare check on the Defendant. She said she also called Mr. Ratti. She said she was very upset when she talked to her sister and to Mr. Ratti. She said she received six or seven telephone calls the next day from the Defendant at her work. She said the Defendant's demeanor during the telephone calls was agitated, aggravated, and angry. She said the Defendant threatened her husband two or three times during these telephone calls.

Ms. Kelley testified that she then received the telephone call from Mr. Harrison. She said that after she heard from Mr. Harrison that the police were at her house, she went home. She acknowledged that she never gave permission to the Defendant to enter her home and that she would not expect the Defendant to stop by her house. She agreed that during the Defendant's first telephone call to her at work, he said he was upset because she had called the police to conduct a welfare check. She identified the Defendant's voice on a 9-1-1 tape.

On cross-examination, Ms. Kelley said that she spoke with the police officers and detectives who came to her house on November 15, 2006. She said she had tried to help the Defendant before November 15, 2006, and admitted she told this to the officers. She acknowledged that she had experience and training that allowed her to assist people who were experiencing difficulties.

The Defendant testified that he was married to Ms. Kelley's sister for approximately twenty-five years and that he had two children. The Defendant said that in 2005, his grandmother, mother-in-law, and father died. He said that Ms. Kelley helped him deal with his emotional stress, that she was the person who remained constant, and that she seemed to want to help him. He said he valued Ms. Kelley's friendship tremendously. The Defendant stated that in November 2006, he and Ms. Kelley had an argument on the telephone. The Defendant said Ms. Kelley threatened him "with her husband and this other gentleman, and I threatened her back." The Defendant stated that he did not mean the threat but that he was just upset. The Defendant said that after he had a chance to reflect on what he had said, he decided to drive to Ms. Kelley's house and apologize to her in person.

The Defendant testified that when he arrived at Ms. Kelley's house, he either rang the doorbell or knocked. He said a black-haired man came to the door. He said he asked the man what the man was doing at the Kelleys' house. He said he did not recognize the man and suspected a home burglary. He said another man entered the house. He said the men did not give him definite answers to his questions but said something about painting. He said he asked the men to explain

why they did not have any paint on them. He said he did not tell the men to go into another room but asked them to wait where they were standing so he could verify their story. He said he did not have a handgun with him or in his car. He said he did not waive a handgun at anyone.

The Defendant testified that he yelled for the Kelleys to see if they were home. He said he turned his back on the two men and proceeded to check the entire home, including the closets. He said he did not find the Kelleys and left. He said the two men ran out the front door when he turned to walk through the house. He said he did not chase the men because he was concerned for the Kelleys' safety. The Defendant testified that he called 9-1-1 and told the police not to bother coming to the house. He said his reason for this was that no one was hurt and he did not want to waste the police officers' time.

The Defendant admitted that he had pled guilty to and been convicted of forgery. He said he "took" a sentence and "finished" it. He admitted that he had been convicted twice of theft. He pled guilty and "finished" his sentences on those convictions.

On cross-examination, the Defendant testified that he feared for the Kelleys' safety and his fear explained his actions. He said he did not know if the men in the Kelleys' house were murderers or burglars. He said he did not develop the story that the men were burglars after learning Mr. Harrison had ten prior burglary convictions. He said he learned from his attorney a week before trial that Mr. Harrison had ten prior convictions.

The Defendant admitted that after his arrest, the majority of his calls from the jail were to Larry Trivette, a retired dentist and his friend. He said he made the calls to Mr. Trivette because Mr. Trivette had the Defendant's possessions, including his car. He said he did not remember calling Mr. Trivette at 6:01 p.m. on November 26, 2006, and telling Mr. Trivette that he and Ms. Kelley had gotten into an argument. He said he did not remember telling Mr. Trivette that Ms. Kelley said she was going to send her husband over to "take care of" the Defendant, nor did he remember telling Mr. Trivette that after thinking about Ms. Kelley's telephone call for an hour, he decided to drive to Ms. Kelley's house. He said he did not remember telling Mr. Trivette that once he arrived at the Kelley house, he rang the doorbell but no one came to the door. He agreed that if he had in fact made such a telephone call to Mr. Trivette, that action would not be consistent with his testimony.

The Defendant testified that he remembered asking Mr. Trivette to call the Defendant's son and daughter. The Defendant said he remembered telling his son that "Ms. Kelley started it by telling me that she was going to send [Mr.] Kelley and David Rosenbalm over here to take care of me," and that made him "go off." The Defendant admitted it was his voice on a recording of a telephone call from the jail to Mr. Trivette. The Defendant stated that he had been to the Kelleys' house more than once on November 15, 2006, and the visit described to Mr. Trivette had occurred later in the day, after the incident with the painters.

The Defendant testified that he did not have a key to Ms. Kelley's house. The State showed the Defendant a copy of the Defendant's handwritten motion to reduce bond. The Defendant said that someone else wrote the motion for him and he signed it. The motion stated that "having arrived at the home of his brother and sister-in-law to which he has a key, he was shocked to find two men

about to leave." The Defendant said that he did not tell the person who wrote the motion that he had a key and he did not know why the writer included that portion of the statement. The Defendant admitted that he signed the motion, filed it with the court, and sent the State a copy.

The Defendant denied that on November 30, 2006, he fabricated a story about coming to the victims' rescue. The Defendant said he lied when he left a voice-mail message for Ms. Kelley saying he had purchased a gun. The Defendant said he did not pull the trigger of a handgun at the end of the voice-mail message but hit a table with a hammer. He said he did not remember calling Ms. Kelley back and leaving another voice-mail message in which he stated that he was waiting on Mr. Kelley and David Rosenbalm, nor did he remember stating on the voice-mail message that he would wait until eleven or twelve o'clock and then he would leave and "take his pistol" with him. He said that even if he had left that voice-mail message, it was a lie because he did not have a pistol. He said that he also used a hammer to strike his table and simulate a gun shot during a November 14, 2006, telephone call to his son. He admitted leaving a voice-mail message for Mr. Kelley at 2:17 p.m. on November 15, 2006, in which he stated that Ms. Kelley "did this" and said he wished Mr. Kelley and David Rosenbalm "would just come over here right now" so that he could "f--- [them] both up."

The Defendant testified that when he arrived at the Kelleys' house, he did not see the Kelleys' cars in the driveway. He said they usually park in the garage. He said the caller identification on his cell phone showed that Ms. Kelley had telephoned him from her house. He agreed that he had called Ms. Kelley at her work, but he said he thought she was at home when he went there to apologize. He said the last time he had been at the Kelleys' house was approximately six months before November 15, 2006. He said that when one of the painters opened the door, he asked the painter's identity. He said the painter made an aggressive step toward him. He said he did not know at that point if the painters were burglars, but he did know they were not family because he had been part of Ms. Kelley's family for twenty-five years. He said that in response to the painter's aggressive step, he urged the painter to back down. He said the painter stepped back into the foyer and that he walked in behind the painter. He said the painter mumbled something about Mr. and Ms. Kelley. He said he feared for his safety but not his life. He admitted that even though he feared for his safety, he still entered the house. He said the painter was not close enough to grab him and that he feared for Ms. Kelley's safety more than his own. He said that he did not believe the man was a painter because the man had no paint on him and carried no paint brushes or paint buckets. He said he did not smell any paint. He said he felt tenser when the second painter entered the house. He said he told the painters to stay where they were in order that he could verify their story. He said he turned his back on the painters but still feared for his safety. He said he continued to look over his shoulder at the painters and saw them go out the front door.

The Defendant testified he did not chase the painters because he was more afraid for Ms. Kelley and because he was outnumbered. He denied using the Kelleys' home telephone to call 9-1-1. He said that he telephoned 9-1-1 from his cell phone after he reached his apartment. He admitted he pretended to be Mr. Kelley on the 9-1-1 call to "squash the whole thing" because "it was a family dispute that got out of hand." He admitted he lied to the 9-1-1 operator. He admitted that when the 9-1-1 operator asked for the address, he had to drive back to the Kelleys' house to get it. He said he rang the doorbell and no one answered. He admitted he called 9-1-1 and pretended to be Mr.

Kelley again so that he could provide the house's address. He said he did not know why he did not ask 9-1-1 to send someone out to check on Ms. Kelley or to look for her. He said he did not try to call Ms. Kelley at her workplace to check on her. The Defendant admitted to prior convictions for forgery and misdemeanor theft.

On redirect examination, the Defendant testified that during a bond motion in December 2007, he stated that he went to Ms. Kelley's house to apologize, that he saw two men he did not know, that he did not threaten them, and that he left. He agreed that he had been asserting this version of events all along. He said that when he stated, "She started it," he meant that Ms. Kelley started the argument and that his statement did not imply that he would retaliate. He said that he rang the Kelleys' doorbell the second time he went to their house, but he could not remember if he rang the doorbell the first time.

On rebuttal, Ms. Kelley testified that she did not call the Defendant on November 15, 2006, and threaten to have her husband and David Rosenbalm beat him up. She said that it was not in her nature to do something like that, that her husband was in Oklahoma City, and that as a trained clinician, she knew better than to agitate someone who was already out of control.

The jury convicted the Defendant of two counts of aggravated burglary and two counts of aggravated kidnapping. The trial court concluded that the aggravated burglary and the aggravated kidnappings constituted separate offenses.

# I. ANALYSIS

On appeal, the Defendant argues that the kidnappings were merely incidental to the aggravated burglary and that he could not be convicted of those crimes. The State contends that the trial court properly declined to merge the Defendant's convictions for aggravated burglary and aggravated kidnapping.

Due process principles are violated when a defendant is convicted of both a kidnapping and an associated felony when the victim's confinement was "essentially incidental" to the associated felony. State v. Anthony, 817 S.W.2d 299, 306 (Tenn. 1991). Facts independent and separate of those necessary to convict the defendant of the associated felony must be shown to sustain a kidnapping conviction. Id. at 301. The supreme court refined the test for whether due process bars a separate conviction for kidnapping in State v. Dixon, 957 S.W.2d 532 (Tenn. 1997). The supreme court stated that although it adheres to the due process principles articulated in Anthony, the two-part test announced in Dixon replaced Anthony's "essentially incidental" analysis. State v. Richardson, 251 S.W.3d 438, 442-43 & 443 n.5 (Tenn. 2008). "The Dixon test 'provides the structure necessary for applying the principles announced in Anthony.'" Id. at 443 (quoting State v. Fuller, 172 S.W.3d 533, 537 (Tenn. 2005)). The Dixon test first requires a court to inquire "whether the movement or confinement was beyond that necessary to consummate the act . . . ." Id. at 535 (citing Anthony, 817 S.W.2d at 306.). In Fuller, the supreme court clarified that Dixon's first prong is a threshold determination. Fuller, 172 S.W.3d at 537. If the first prong is satisfied, the court next must determine "whether the additional movement or confinement: (1) prevented the victim from

summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Dixon, 957 S.W.2d at 535.

Whether a separate kidnapping conviction violates principles of due process is a question of law determined initially by the trial court. Fuller, 172 S.W.3d at 535 (citing State v. Cozart, 54 S.W.3d 242, 247 (Tenn. 2001)). Appellate review of the trial court's determination is de novo with no presumption of correctness. Griffin v. State, 182 S.W.3d 795, 798 (Tenn. 2006).

The Anthony rule was designed to prevent a defendant from being convicted of kidnapping when the confinement was only that necessary to complete a rape or robbery. Id. at 534-35. Tennessee's broad statutory definition of kidnapping "'could literally overrun' crimes such as robbery and rape because detention and confinement against the will of the victim necessarily accompany these crimes." State v. Richardson, 251 S.W.3d 438, 442 (Tenn. 2008) (citing Anthony, 817 S.W.2d at 303; and quoting People v. Levy, 204 N.E.2d 842, 844 (N.Y. 1965)); see T.C.A. §§ 39-13-301 to -305 (2006 & Supp. 2008). During the commission of a rape or robbery, a victim may often be held "'briefly at gunpoint,' 'bound and detained,' or 'moved into and left in another room or place.'" Richardson, 251 S.W.3d at 442-43 (quoting Levy, 204 N.E.2d at 844). In this regard, the purpose of the confinement or removal is at issue, not the distance or duration. Dixon, 957 S.W.2d at 535. However, when this brief confinement or removal goes beyond what is necessary to accomplish the associated rape or robbery, a separate conviction for kidnapping does not violate principles of due process. Anthony, 817 S.W.2d at 306.

The supreme court has declined to extend the Anthony rule to separate convictions for automobile burglary and theft. State v. Ralph, 6 S.W.3d 251, 254-55 (Tenn. 1999). This court has likewise declined to extend the Anthony rule to separate convictions for attempted first degree murder, aggravated burglary, and especially aggravated robbery. State v. Cowan, 46 S.W.3d 227, 234 (Tenn. Crim. App. 2000). While every robbery or rape involves some detention of the victim, not every burglary involves kidnapping. See id. at 235. Unlike the offense of kidnapping, the offense of aggravated burglary is narrowly defined by statute and its elements are clearly defined. Id. at 234; see T.C.A. §§ 39-14-401 to -404 (2006 & Supp. 2008); see also Ralph, 6 S.W.3d at 255. Aggravated burglary is a property offense, and the crime is complete upon entry into the habitation. Cowan, 46 S.W.3d at 234 (citing T.C.A. §§ 39-14-402(a)(1), - 403(a)). The Defendant in this case completed the offense of aggravated burglary the moment he entered the Kelleys' home with the intent to commit an assault on Ms. Kelley. The confinement and removal of the painters to the parlor were separate offenses.

## II. CONCLUSION

We hold that the Defendant's convictions for aggravated burglary and aggravated kidnapping do not violate principles of due process under Anthony. In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-8-