NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1005n.06

No. 11-5748

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| QUINCEY BLANKS, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | **O P I N I O N** |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

Before:  MOORE, WHITE, and LUCERO,[*] Circuit Judges.

**CARLOS F. LUCERO, Circuit Judge.**  Quincey Blanks pled guilty to possessing a firearm as a felon in violation of 18 U.S.C. § 922(g).  On the theory that Blanks had used the firearm in the commission of a robbery under Tennessee law, his Presentence Investigation Report ("PSR") recommended that the district court cross-reference the relevant United States Sentencing Guidelines for robbery.  In the alternative, the government argued that the kidnaping Guidelines could also be applied.  Together with an enhancement

---

[*]     The Honorable Carlos F. Lucero, Circuit Judge for the United States Court of Appeals for the Tenth Circuit, sitting by designation.

1

for obstruction of justice and Blanks' criminal history, application of either the robbery or the kidnaping Guidelines yielded a sentencing range in excess of the statutory maximum of 120 months. The court sentenced Blanks to 108 months' imprisonment and three years' supervised release. Blanks contends that the district court erred in calculating this sentence. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I

In a sentencing hearing that lasted a day and a half, the district court heard testimony from several witnesses. Keela Suggs, the government's lead witness, testified that she knew Blanks because he was good friends with Orico "Rico" Donaldson, her on-again, off-again boyfriend. Keela testified that on March 3, 2009, she was sitting in her apartment in Memphis, Tennessee, with various family members, including her daughters Jasmine and Johneshia, ages sixteen and fourteen; her cousin Jerald Kirkwood, age twenty-three; her mentally handicapped sister; and several young children.

Keela testified that shortly after 5 p.m., Blanks knocked on her door and let himself in. According to Keela, he took her into the kitchen and demanded repayment of a debt, which Keela assumed had been incurred by Rico. According to Keela, Blanks then left the house and reentered with a gun. She says he "cocked" the gun, or chambered a round, held it to her head, and demanded her bank card. He then referenced the well-known brutal murder of an entire family on Lester Street in Memphis; Keela understood this as a threat to murder everyone in the house if she did not pay him. At this point, Blanks' father, Gary

2

Porter, entered the house and asked Blanks to leave the apartment, but Blanks refused. Fearing Blanks' threats, Keela told Blanks that her daughter, Jasmine, had the bank card. According to Keela, Blanks then directed his gun towards Jasmine and Jerald and told them that they were going to the bank with him. Keela testified that Blanks led Jasmine and Jerald at gunpoint out of the front door, as she sat terrified on the couch. Jasmine and Jerald then ran back inside and slammed the door, saying that the police had arrived. Keela heard Blanks banging on the door and pleading to be let in, but they locked the door and Blanks was arrested.

On cross-examination, defense counsel asked if Blanks regularly came on the second of the month; Keela replied that he did not. She further maintained that she did not owe Blanks any money, and that she had never borrowed money from Blanks to buy drugs. She conceded, however, that she had used drugs in the past, and she candidly admitted that she was high at the time of the events in question. Nevertheless, she maintained that she had a clear recollection. Keela also admitted that, due to her drug addiction, she allowed her daughter Jasmine to hold her bank card.

Keela's testimony was largely corroborated by Jasmine and Johneshia, her two daughters, and Jerald, her cousin. Jasmine testified that Blanks reentered the house with the gun and held it to Keela's head. She also affirmed that Blanks made a threatening reference to Lester Street and cocked the gun. She further stated that Blanks ordered her, along with Jerald, to go to the bank to get money, and that he led them at gunpoint towards the door.

3

She said she exited the door but did not get to the car, and that Jerald was in front of her and his foot was touching the car when the police pulled up. At that point, Jasmine and Jerald ran back in the house and slammed the door.

On cross examination, defense counsel pressed Jasmine on her possession of the bank card. Jasmine initially said that she had the card on that day, and that she had it "other days," but that she was not in the habit of keeping the card. Defense counsel played Jasmine a recording of her previous testimony in a state proceeding in which she testified that she always had the card. Jasmine maintained that she only held the card sometimes and confirmed that she and her mother shared the card and both had the code. When asked whether she held the card because of her mother's addiction, Jasmine replied that she was not aware that her mother had a drug problem.

Jerald confirmed that Blanks made the Lester Street threat, cocked the gun, held it to Keela's head, and forced Jasmine and him towards the door to go the bank. Jerald said that when the police arrived, he was about to get in the car and Jasmine was behind him, closer to the front door. According to his testimony, Jerald then darted back in the front door, which was only a few feet from where he was standing. He also said that he and Jasmine were able to slam the door before Blanks entered, and that Blanks pounded on the door, pleading to come in. Anticipating Blanks' version of the events, the prosecution asked whether Jerald owned any brass knuckles and whether he ever hit Blanks. Jerald replied to both questions in the negative.

4

Johneshia Suggs, Keela's younger daughter, testified next. She testified that when Blanks entered and held the gun to Keela's head, she ran to the back bedroom and called 911. Johneshia admitted that she told the 911 operator that her mother was outside the house, which contradicted her family members' earlier testimony that only Jasmine and Jerald were forced outside while Keela remained on the couch. Although she appeared confused initially, she eventually explained that from the back bedroom she could not see into the front room or outside and that her statement to the 911 operator was based only on what she could hear.

Memphis Police Officer Carlos Castillo testified that when he and his partner arrived on the scene, he saw Jerald run into the house and slam the door, leaving Blanks on the doorstep trying to get in. He said that the back door of the car was open and that Blanks' father was in the driver's seat. Castillo testified that he recovered a gun from Blanks that had one bullet in the chamber and three in the magazine, confirming the Suggs' testimony that Blanks had cocked the gun in the apartment. Castillo further testified that he also found brass knuckles in Blanks' pocket. After arresting Blanks, Castillo went into the apartment to talk to the family. He described them as highly excitable and upset. Castillo also summarized the statements that they gave on the scene, which were mostly consistent with their hearing testimony.

On cross examination, defense counsel presented an evidence report stating that four bullets were in the magazine when the gun was logged at the police station. Castillo affirmed that he unloaded the chambered gun on the scene and said that he would never put a bullet

5

back in the magazine. Defense counsel also presented the arrest ticket, which omitted any mention of the Lester Street threat. Castillo testified that he remembered one of the family members reporting that threat, though he could not remember which one. Castillo explained that his partner wrote the arrest ticket; therefore, although Castillo said he would have included that detail had he written the ticket, he could not explain its omission. Defense counsel also noted that the arrest ticket stated that Jerald separated Keela and Blanks and pushed Blanks out the door—a fact that had no place in the family's stories. This detail was apparently based on the family's statements at the scene, and Castillo agreed that the family had told him as much.

When Blanks took the stand, he presented a vastly different version of events. He said he went to Keela's apartment on March 3 because she owed him $500 and he knew she was expecting money that day. Blanks said that he knocked on Keela's door and Jerald let him in. Once inside, Keela called him into the kitchen and told him she did not have the money yet. Accordingly to Blanks, as he and Keela were arguing over the alleged debt, Jerald came at him from behind, punching him in the back of the neck with brass knuckles. Blanks testified that the force of the blow caused him to fall over and hit his head on the front door hard enough to leave a goose egg. At that point, Blanks admitted that he pulled out his gun, which he had been carrying in his pocket because he had been shot at Keela's house on a previous occasion. Blanks pointed the gun at Jerald and told him to drop the brass knuckles, which Blanks put in his pocket. According to Blanks, it was at this point that his father

6

entered and pulled him out of the house, as Jerald stood outside the doorway "talking smack." Then, Blanks testified, the police arrived and he was arrested.

Blanks admitted to being in the unlawful possession of the gun and to committing an aggravated assault, but adamantly maintained that he did not try to force Jasmine and Jerald to go to the bank. He further testified that he never chambered a round in the gun and never made the Lester Street threat. In fact, he claimed that he did not know about the Lester Street murders because he was living in Florida when they were in the news.

Reviewing the testimony, the district court found Keela, Jasmine, and Jerald to be credible witnesses. The court acknowledged Keela's drug use and noted the potential for faulty recollection but concluded that she had not deliberately falsified her testimony. In contrast, the court found that Blanks was not a credible witness. Based on the credibility findings, the court found that Blanks led Jasmine and Jerald at gunpoint to the car in order to take them to the bank for money. The court further concluded, contrary to Blanks' testimony, that Jerald did not punch Blanks in the head with brass knuckles. Additionally, the court found that Blanks had chambered a round and made the Lester Street threat, and that his statements to the contrary were false.

The court also addressed some potential inconsistencies in the credited witnesses' testimonies. It noted that the arrest ticket stated that Jerald pushed Blanks out the door, although Keela, Jasmine, and Jerald all testified that Jerald only slammed the door behind him when he ran in the house as the police were arriving. But the court concluded that the

officers "didn't quite understand what was being said," which it attributed to the "hysterical" environment at the crime scene. Turning to the issue of the cocked gun, the judge credited Castillo's testimony that there was a bullet chambered when he recovered the gun from Blanks. The court found "nothing inconsistent" between the eyewitnesses' testimony stating that Blanks chambered the gun and the evidence report, which listed four bullets in the magazine. owever, the court left at least one inconsistency unexplained: It did not address Jasmine's testimony that she was unaware of her mother's drug problem.

Based on his factual findings, the court concluded that use of the kidnaping Guidelines was proper. In the alternative, the court found that use of the robbery Guidelines was also proper. Together with a two-level enhancement for obstruction of justice, and Blanks' category III criminal history, both the kidnaping and robbery Guidelines yielded sentencing ranges in excess of the statutory maximum of 120 months. After considering the factors contained in 18 U.S.C. § 3553(a), the court sentenced Blanks to 108 months' imprisonment and three years' supervised release.

## II

This court must accept the district court's factual findings unless they are "clearly erroneous." *United States v. Williams*, 355 F.3d 893, 898 (6th Cir. 2003). A factual finding is clearly erroneous "when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006). "[W]here there are two permissible views of the evidence, the district

8

court's conclusions cannot be clearly erroneous." *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999) (quotation omitted). The district court's application of the facts to the Guidelines is accorded "due deference," *Williams*, 355 F.3d at 897, and its legal conclusions are reviewed de novo, *United States v. Latouf*, 132 F.3d 320, 330 (6th Cir. 1997).

**A**

United States Sentencing Guideline § 2K2.1, the Guideline that applies to firearm offenses, instructs courts to apply another section, § 2X1.1, if the weapon was used in the commission or attempted commission of "another offense." *See* U.S.S.G. § 2K2.1(c)(1). "[A]nother offense" includes "any federal, state, or local offense . . . regardless of whether a criminal charge was brought, or a conviction obtained." *Id*. cmt. n.14(C). Under Tennessee law, kidnaping is defined as the "knowing[] remov[al] or confine[ment] of another unlawfully so as to interfere substantially with the other's liberty" that exposes the victim to "substantial risk of bodily injury." *State v. Richardson*, 251 S.W.3d 438, 441-42 (Tenn. 2008) (citing Tenn. Code §§ 39-13-302(a) and 39-13-303(a)) overruled on other grounds, *State v. White*, 362 S.W.3d 559 (Tenn. 2012). An individual runs afoul of Tennessee's criminal attempt statute if he acts with the mens rea required for an offense and, inter alia, "[a]cts with the intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code § 39-12-101(a)(3). Finding that Blanks attempted to force Jasmine and Jerald

9

to go to the bank, the district court concluded that Blanks used an unlawful firearm in the attempted commission of a kidnaping under Tennessee law. On that basis, it used the base offense level for kidnaping to calculate his sentence. *See* U.S.S.G. § 2A4.1.

There is no dispute that the district court's factual findings were legally sufficient to support use of the kidnaping Guidelines. *See United States v. Grimes*, 348 F. App'x 138, 140 (6th Cir. 2009) (unpublished) (approving the use of the kidnaping Guidelines in light of the district court's conclusion that a felon-in-possession defendant committed a kidnaping under Tennessee law when he led a victim at gunpoint approximately seventy yards). Instead, Blanks contends that the findings were factually erroneous because the district court credited testimony from the government's witnesses, whom Blanks deems unreliable. Given the considerable deference we accord to a district court's credibility determinations, *see, e.g., United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990), this is an uphill battle.

Blanks seeks to mount this challenge by pointing out relatively minor inconsistencies that are not directly relevant to the district court's determination that Blanks attempted to force Jasmine and Jerald to go to the bank. But the district court explained and dismissed almost all of the discrepancies to which he points. Blanks seizes on the fact that the arrest report stated that Jerald pushed Blanks out of the front door despite contrary testimony from Keela, Jasmine, and Jerald. But Blanks ignores the district court's persuasive explanation of this discrepancy: that in the highly charged scene just after the crime, the recording officer misunderstood the family's retelling of the events. And although the district court did not

10

address Jasmine's claimed ignorance of Keela's drug problem, a child's reluctance to admit to her mother's addiction in court is certainly understandable.

We conclude that the district court's decision to credit testimony from the prosecution witnesses had a sound basis. Keela, Jasmine, and Jerald are eyewitnesses who presented largely consistent versions of the events, and their testimony was corroborated in substantial part by a police officer. The district court's decision to discredit Blanks' version of events was also well-founded. The court found Blanks' assertion that Jerald punched him with brass knuckles—which was central to his story—particularly unbelievable, especially in light of the two men's comparative physiques and demeanors. We would be remiss to rely on a "cold record" to overturn the determination of a trial court that benefitted from such in-person observations. *See Cooke*, 915 F.2d at 252.

Blanks has not—and cannot—cite any case where this court has reversed a district court's credibility determinations based on such minor inconsistencies. Even if some of these contradictions were not fully explained, they do not leave us "with the definite and firm conviction that a mistake has been committed." *Tran*, 447 F.3d at 943; *see also United States v. Miller*, 161 F.3d 977, 984 (6th Cir. 1998) (even absent detailed factual findings, a reviewing court may examine the record to determine if the district court committed clear error). In sum, we see no error in the district court's use of the kidnaping Guidelines; thus, there is no need to consider whether the robbery Guidelines might also have provided a basis for Blanks' sentence.

11

**B**

Blanks also challenges the obstruction-of-justice enhancement that the district court imposed based on its finding that Blanks lied in the sentencing hearing. The comments to the Guidelines make clear that committing perjury or otherwise providing materially false information to a judge constitutes an obstruction of justice. U.S.S.G. § 3C1.1 cmt. n.4 (B), (F). In these situations, a district court must: "(1) identify those particular portions of defendant's testimony that it considers to be perjurious; and (2) either make a specific finding for each element of perjury or, at least, make a finding that encompasses all of the factual predicates for a finding of perjury." *United States v. Lawrence*, 308 F.3d 623, 632 (6th Cir. 2002). There are three factual elements of perjury: (1) a false statement under oath; (2) concerning a material matter; and (3) with the willful intent to provide false testimony. *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

Blanks first argues that the district court did not make factual findings sufficient to support an obstruction-of-justice enhancement. We disagree. The government points to four portions of Blanks' testimony that the district court specifically determined to be false. To take just one example, the district court stated that Blanks' denial of chambering a round was "a falsehood, materially false statement, intentionally materially false." In light of the court's specificity on this point, we conclude that its findings sufficed to support the enhancement.

Perhaps realizing the weakness of his insufficient-findings argument, Blanks recapitulates his attack on the district court's credibility findings. Specifically, he argues that the district court clearly erred by crediting the testimony that he chambered a round in the gun, given that the police evidence log showed that all of the bullets remained in the magazine. But Officer Castillo testified that he recovered the gun from Blanks with a round chambered, and it is certainly conceivable that the evidence log suffered from human error. Given Castillo's testimony, and the consistent testimony of the three eyewitnesses, the district court did not commit clear error when it found that Blanks chambered a round and perjured himself by subsequently denying this fact under oath.

## C

Finally, Blanks argues that the district court erred by not granting a downward adjustment for acceptance of responsibility. *See* U.S.S.G. § 3E1.1. Because Blanks never requested this adjustment, plain error review applies. *See United States v. Davis*, 397 F.3d 340, 346 (6th Cir. 2005).

According to the Guidelines commentary, a false denial of relevant conduct is "inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1 cmt. n.1. Likewise, this Court has recognized that defendants who have obstructed justice are eligible for acceptance-of-responsibility adjustments only in "extraordinary cases." *United States v. Jeross*, 521 F.3d 562, 581 (6th Cir. 2008) (quoting U.S.S.G. § 3E1.1 cmt. n.4). A district court has "great leeway" in determining whether a case is "extraordinary," although this is a question of law

13

that is reviewed de novo. *Id*. at 581-82. Relevant considerations include "the defendant's truthful admission of the offense conduct, the defendant's voluntary assistance to authorities in resolving the offense, and the timeliness of the defendant's conduct in affirmatively accepting responsibility for his actions." *United States v. Gregory*, 315 F.3d 637, 640 (6th Cir. 2003).

Blanks argues that he is entitled to the adjustment because he pled guilty and admitted to unlawfully possessing a firearm. Although this is true, the district court also found that he made materially, intentionally false statements <u>after</u> pleading guilty. Accordingly, he cannot show that the district court erred in deeming his an ordinary case, and he certainly cannot demonstrate plain error.

**III**

**AFFIRMED**.