IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
October 3, 2007 Session

## STATE OF TENNESSEE v. ANTONIO D. RICHARDSON

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court of Davidson County**
**No. 2003-B-1458     Steve Dozier, Judge**

_____

**No. M2005-01161-SC-R11-CD - Filed May 7, 2008**

_____

The defendant, Antonio Richardson, was convicted of two counts of especially aggravated kidnapping, one count of felony reckless endangerment, one count of aggravated assault, and one count of burglary. In addition, the defendant pleaded guilty to attempted especially aggravated robbery. The Court of Criminal Appeals ruled that the kidnappings were essentially incidental to the attempted especially aggravated robbery and therefore the kidnapping convictions violated due process under the principles stated in State v. Anthony. We reverse the intermediate appellate court and reinstate the convictions.

**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgment of the Court of Criminal Appeals Reversed;**
**Case Remanded to Trial Court**

JANICE M. HOLDER, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined. GARY R. WADE, J., not participating.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; C. Daniel Lins, Assistant Attorney General; and Pamela Sue Anderson, Assistant District Attorney General, for the appellant, State of Tennessee.

Ross Alderman, Public Defender, and Emma Rae Tennent, J. Michael Engle, and Graham Prichard, Assistant Public Defenders, Nashville, Tennessee, for the appellee, Antonio D. Richardson.

**OPINION**

Facts

Allison Howell ("Howell") and Johnnie Lucas ("Lucas") were managers at a Calhoun's restaurant in Nashville. Antonio Richardson ("Richardson") was a line cook for the restaurant. On January 12, 2003, both managers were on duty. Richardson finished his shift and watched football

games in the restaurant from mid-afternoon until late in the evening. At some point that evening, Richardson went into the bathroom and waited for the restaurant to close. After the restaurant closed for the night, Lucas went upstairs to the manager's office located directly above the kitchen and deposited the night's receipts in the office safe. Shortly thereafter, Richardson, wearing a ski mask and white latex gloves, emerged from an employees' bathroom under the stairway. He moved past two kitchen employees, grabbed Howell, put a gun to her head, and pushed her up the stairs toward the manager's office.[1] He asked Howell who was in the office, and Howell replied that Lucas was there. Richardson took Howell past the office door to a partially caged area in the stock room. He struck Howell in the head with the gun, injuring her and causing her to fall to the floor.

Richardson went to the office door and knocked on it. When Lucas opened the door, Richardson pointed his gun at her and pushed her to the floor. Richardson asked her where the money was, and Lucas replied that she had already put it in the safe. Richardson dragged Lucas to the safe and demanded that she open it. Lucas testified that the safe was very old and difficult to open. While Lucas attempted unsuccessfully to open the safe, Richardson struck her repeatedly with a metal three-hole punch. Lucas sustained injuries to her head and hand from the beating. At some point, Richardson asked Lucas for the combination to the safe, which Lucas provided. When Lucas continued to fail in her attempts to open the safe, Richardson threatened to shoot her. Richardson then straddled Lucas as she lay on the floor, striking her repeatedly with the gun. Howell testified that she could hear Richardson beating Lucas for approximately twenty minutes.

While Richardson and Lucas were in the office, Richardson's accomplice[2] went to the stock room and bound Howell's hands behind her with duct tape. Later, the accomplice returned to the stock room and asked Howell for the safe combination. He returned to the manager's office with that information.

Richardson dragged Lucas by her hair to the "fan room," a little-used room through which the exhaust fans are vented. There, he struck Lucas in the face with the gun, severing her right optic nerve and causing the loss of her eye. Before leaving, Richardson threatened to kill Lucas if she moved. Richardson and his accomplice were apparently unable to open the safe and left the restaurant without obtaining any money.

Lucas left the fan room and found Howell lying in the caged area of the stock room. Lucas helped Howell stand and assisted in removing the duct tape from her hands. They briefly returned to their prior positions after hearing a noise. After a short time, Howell and Lucas ran to the unoccupied office and locked the door. They called 911 and hid under the desk to wait for the police.

---

[1] Two additional employees were located near the front of the restaurant. After they joined the kitchen employees to hide in the second floor dining room for a period of time, three of the employees left the restaurant and called the police from the parking lot.

[2] Howell testified that she later realized a second person was behind her as Richardson pushed her up the stairs.

When the police arrived, they found Richardson hiding in the bushes outside the restaurant. He was covered in blood. The police also found a ski mask, a bloody white latex glove, and a bloody gun with a broken grip in the bushes where Richardson was found. Richardson admitted to being involved in the robbery. Richardson told the police that he struck Howell to knock her out and prevent her from calling the police. He also stated that his accomplice struck Lucas in the fan room "to shut her up." The accomplice was never found.

Richardson pleaded guilty to the charge of attempted especially aggravated robbery. A jury convicted him of the burglary of the restaurant and the especially aggravated kidnappings of Lucas and Howell. Richardson was convicted of reckless endangerment and aggravated assault of the two employees located in the kitchen when he targeted Howell. Only the especially aggravated kidnapping convictions are at issue on appeal.

The Court of Criminal Appeals reversed the convictions for the especially aggravated kidnappings of Lucas and Howell, holding that the kidnappings were essentially incidental to the attempted especially aggravated robbery and therefore the kidnapping convictions violated the due process principles announced in State v. Anthony, 817 S.W.2d 299 (Tenn. 1991).[3] We granted the State's application for permission to appeal.

Analysis

Anthony

We begin our review with a discussion of State v. Anthony. In State v. Anthony and State v. Martin, this Court heard consolidated appeals to address whether a kidnapping conviction, separate from an accompanying offense, would violate due process. Both defendants in the consolidated cases were convicted of aggravated kidnapping and armed robbery. In Anthony, the defendant entered a restaurant and ordered two employees at gunpoint to an office, while his accomplice detained three other employees at dumpsters outside the restaurant. The defendant demanded that the employees in the office open the safe. When the employees informed the defendant that the safe was in a different part of the restaurant, he instructed one of the employees to remain in the office. The defendant and the second employee went to the location of the safe where the defendant was successful in obtaining money. He then encountered a third employee inside and instructed him to return to the restroom from which he had emerged. The defendant and his accomplice fled. The entire episode lasted approximately five minutes. In Martin, the defendant entered an insurance agency and robbed two people at gunpoint. He ordered the two individuals into a bathroom and left the building with approximately two hundred dollars he had obtained. The episode took about four minutes.

---

[3] The trial court ordered that sentences for counts one and two, which merged as a matter of law, be served consecutively to counts three, four, and six for an effective sentence of sixty-four years. Other parts of the judgment suggest an effective sentence of sixty-seven years. On remand, the trial court should correct the judgments as necessary.

We held that due process principles, specifically article I, section 8 of the Tennessee Constitution, require us to determine "whether the confinement, movement, or detention is essentially incidental to the accompanying felony . . . or whether it is significant enough, in and of itself, to warrant independent prosecution." Anthony, 817 S.W.2d at 306. We determined that the convictions for aggravated kidnapping were "essentially incidental" to the robberies and thus violated due process. We held that the kidnappings were "essentially incidental" based upon the following factors: (1) the removal or confinement did not substantially increase the risk of harm to the victims; (2) the victims' movement was slight; (3) the confinement was brief; and (4) the victims were not harmed. Id. at 307.

Our holding in Anthony was prompted by amendments to the kidnapping statutes that no longer require the common law elements once necessary to a conviction for kidnapping. In 1990, the General Assembly amended the kidnapping statute to more broadly define kidnapping as "false imprisonment . . . [u]nder circumstances exposing the other person to substantial risk of bodily injury." Act of Apr. 30, 1990, 1990 Tenn. Pub. Acts ch. 982, § 1 (codified as amended at Tenn. Code Ann. § 39-13-303(a) (2006)). False imprisonment is to "knowingly remove[] or confine[] another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (2006). This definition of false imprisonment codifies the common law and "broadly addresses any situation where there is an interference with another's liberty." Id. § 39-13-302, Sentencing Comm'n Cmts.[4]

Anthony recognized that the modern definition of kidnapping "could literally overrun" crimes such as robbery and rape because detention and confinement against the will of the victim necessarily accompany these crimes. 817 S.W.2d at 303 (quoting People v. Levy, 204 N.E.2d 842, 844 (N.Y. 1965)). We noted that a victim is commonly confined "briefly at gunpoint," "bound and detained," or "moved into and left in another room or place." Id. (quoting Levy, 204 N.E.2d at 844). The legislature did not intend, however, "that every robbery should also constitute kidnapping, even though a literal reading of the statute might suggest otherwise." Id. at 306.

Whether a separate kidnapping conviction violates due process is a question of law to be determined initially by a trial court. State v. Cozart, 54 S.W.3d 242, 247 (Tenn. 2001). We review the trial court's determination de novo with no presumption of correctness. See Griffin v. State, 182 S.W.3d 795, 798 (Tenn. 2006).

---

[4] The especially aggravated kidnapping statute was amended to define especially aggravated kidnapping as "false imprisonment . . . [a]ccomplished with a deadly weapon . . . or . . . [w]here the victim suffers serious bodily injury." Act of Apr. 30, 1990, 1990 Tenn. Pub. Acts ch. 982, § 1 (codified at Tenn. Code Ann. § 39-13-305(a)(1), (4) (2006)).

Dixon

We modified <u>Anthony</u> in <u>State v. Dixon</u>, 957 S.W.2d 532, 535 (Tenn. 1997). In <u>Dixon</u>, the defendant was charged with kidnapping for "seizing or confining the victim to 'facilitate the commission of [a] felony.'" <u>Id.</u> The victim was walking along a lighted street when the defendant grabbed her, covered her mouth, and slammed her to the ground. He then began choking her. He dragged her thirty to forty feet from the illuminated sidewalk to a vacant lot behind some foliage. Dixon was convicted of kidnapping and attempted sexual battery.

In place of the <u>Anthony</u> "essentially incidental" analysis, we crafted an improved, two-part test in <u>Dixon</u> to determine whether a separate kidnapping conviction violates due process. <u>Id.</u> First, we must determine if the movement or confinement of the victim was beyond that necessary to consummate the accompanying crime. <u>Id.</u> This first prong of the <u>Dixon</u> test is a threshold determination. A showing that the movement or confinement was merely helpful to the commission of the accompanying crime will not establish a due process violation under the first prong of the <u>Dixon</u> test. Rather, the first prong of the <u>Dixon</u> test focuses on whether the movement or confinement was *necessary* to consummate the accompanying crime. <u>Id.</u> If the movement or confinement was necessary to consummate the accompanying crime, then a separate kidnapping conviction violates due process, and no further analysis is required.

If, instead, the movement or confinement was beyond that necessary to consummate the accompanying crime, then the second prong must be addressed. The second prong considers "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." <u>Id.</u>

The <u>Dixon</u> two-part test fully replaces the <u>Anthony</u> "essentially incidental" analysis. As we previously have observed, the <u>Dixon</u> test "provides the structure necessary for applying the principles announced in <u>Anthony</u>." <u>State v. Fuller</u>, 172 S.W.3d 533, 537 (Tenn. 2005).[5] Although we adhere to the due process principles adopted in <u>Anthony</u>,[6] we now make clear that the <u>Anthony</u> analysis

---

[5] In <u>Fuller</u>, we stated that the "first question in the <u>Dixon</u> analysis – whether the movement or confinement used was beyond that necessary to commit the accompanying felony – does not replace the 'essentially incidental' test" in <u>Anthony</u>. <u>Id.</u> In other words, the first question in <u>Dixon</u>, being merely a threshold determination, does not replace the "essentially incidental" analysis in <u>Anthony</u>. It is, instead, the entire two-part <u>Dixon</u> test that has replaced the "essentially incidental" analysis in <u>Anthony</u>.

[6] At the time of <u>Anthony</u>, this Court relied on the <u>Blockburger</u> double jeopardy test, which required courts to examine the offenses to determine "whether each [statutory] provision requires proof of a fact which the other does not." <u>Blockburger v. United States</u>, 284 U.S. 299, 304 (1932); <u>see Anthony</u>, 817 S.W.2d at 303. We held in <u>Anthony</u> that the <u>Blockburger</u> double jeopardy test was not adequate to resolve the issue of whether a separate kidnapping conviction may be imposed because "[t]he essential elements of kidnapping and robbery are obviously separate and distinct, and simultaneous convictions on these two charges would not necessarily violate the rule in <u>Blockburger</u>." <u>Id.</u>

(continued...)

5

should not be used in conjunction with the Dixon two-part test. The Dixon test should be used exclusively in all future inquiries.

Our analysis does not differ when the kidnapping conviction is accompanied by a conviction for criminal attempt. A defendant may be convicted of criminal attempt based on conduct constituting a substantial step toward the commission of the offense. Tenn. Code Ann. § 39-12-101(a)(3) (2006). Conduct does not constitute a substantial step, however, "unless the person's entire course of action is corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b). For due process purposes, we likewise must take into account that a defendant intends to commit an offense, not an attempt. We must consider a defendant's entire course of action. We therefore reject the view that after an initial substantial step toward the commission of the offense, any movement or confinement of the victim always will be beyond that necessary to consummate the attempt. At the other end of the spectrum, we also reject the view that because an attempt continues until a defendant's efforts are abandoned, any movement or confinement of the victim never will be beyond that necessary to consummate the attempt. In short, no bright line exists for making the threshold determination in the first prong of the Dixon test. The inquiry is fact-driven. Distance of the victim's movement and duration or place of the victim's confinement are factors to be considered in determining if the movement or confinement was beyond that necessary to consummate the accompanying felony, be it an attempt or a completed crime.

In Dixon, we held that Dixon's movement of the victim to the back of a dark lot was beyond that necessary to consummate the attempted sexual battery because Dixon could have attempted to sexually penetrate the victim on the lighted path where he initially assaulted her. 957 S.W.3d at 535. Having answered affirmatively the first question of the two-prong test, we next considered whether the additional movement or confinement (1) prevented the victim from summoning help, (2) lessened the defendant's risk of detection, or (3) created a significant danger or increased the victim's risk of harm. Id. We held that Dixon moved the victim to the back of a dark lot to avoid detection. Id. In addition, Dixon's movement of the victim from the illuminated path to a dark and vacant lot substantially increased the victim's risk of harm by lessening the chance the crime would be detected. Id.

Application of Dixon to Howell

Beginning with the first prong of the Dixon test, we must determine whether Howell's movement or confinement was beyond that necessary to consummate the attempted especially aggravated robbery. Especially aggravated robbery is the intentional or knowing theft of property

---

[6] (...continued)

Five years later, in State v. Denton, 938 S.W.2d 373, 381 (Tenn. 1996), this Court expanded the inquiry under double jeopardy principles to include a Blockburger analysis of the statutory elements, a comparison of the purpose of the respective statutes, and a fact-specific inquiry to determine the evidence available to prove each offense and whether there were multiple victims or discrete acts. The parties have failed to question either in this Court or in the Court of Criminal Appeals whether the Denton double jeopardy analysis would be an adequate substitute for the current Dixon due process inquiry. We leave that question for another day.

6

from a person, accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. §§ 39-13-401, -403 (2006).

Howell informed Richardson as they walked to the stock room that Lucas was in the office. Rather than leading Howell to the office where the safe was located, Richardson moved her to an empty stock room. Howell provided Richardson's accomplice with the combination to the safe while she was confined. Richardson's accomplice then bound Howell's hands behind her back. Howell continued to be bound and confined for over twenty minutes. While Howell's movement to and confinement in the stockroom may have been helpful to Richardson, we conclude that this movement and confinement were beyond that necessary to consummate the attempted especially aggravated robbery.

Having answered affirmatively the first question of the Dixon test, we now turn to the second prong. A separate conviction for kidnapping does not violate due process if "the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Dixon, 957 S.W.2d at 535.

Howell's confinement to the stock room clearly satisfies the first factor of Dixon's second prong. Richardson stated that Howell's restraint was intended to prevent her from calling the police. Therefore, the purpose behind the confinement was to prevent the victim from summoning help. Neither Howell's later removal of the duct tape nor her call to 911 from the office compels a contrary result. As we pointed out in Fuller, "the ultimate success of the confinement is not an integral part of the test." 172 S.W.3d at 537. We decline to provide Richardson with a free kidnapping merely because Richardson and his accomplice were unsuccessful in preventing Howell from summoning help.

Howell's confinement also implicates the second and third factors of Dixon's second prong. By preventing Howell from summoning help, Richardson also lessened his risk of detection. In addition, Richardson struck Howell on the head with his gun, causing an open head wound that required two staples to close. Howell's confinement increased her risk of harm by leaving her severe head injury untreated. For these reasons, the especially aggravated kidnapping conviction in reference to Howell's confinement does not violate due process.

Application of Dixon to Lucas

The confinement of Lucas to the office and her movement and confinement to the fan room also were beyond that necessary to consummate the attempted especially aggravated robbery. After Lucas unsuccessfully attempted to open the safe and provided Richardson with the combination to unlock the safe, Richardson continued to confine Lucas to the office while beating her for approximately twenty minutes. Although the use of force is not a direct element of Dixon's first prong, the length of time that Richardson beat Lucas in the office is relevant to show that the restraint was excessive and beyond that necessary to consummate the attempted especially

7

aggravated robbery. Moreover, we reject the suggestion that a twenty-minute beating of Lucas as she lay curled on the floor was designed to assist in procuring Lucas' cooperation in opening the safe. Instead, we conclude that the use of force for an excessively long period shows that Lucas was no longer confined to assist in opening the safe.

Even if Lucas' confinement in the office had not been sufficient to meet the first prong of the Dixon test, the subsequent movement and confinement of Lucas to the fan room clearly went beyond that necessary to consummate the attempted especially aggravated robbery. Lucas gave Richardson the combination to the safe after attempting unsuccessfully to open it. At that point, Richardson either could have continued his attempt to open the safe with Lucas in the office or abandoned his efforts and left the restaurant without moving Lucas. Richardson, however, moved Lucas to the fan room. We reject the assertion that moving Lucas was necessary because the office was very small and Richardson needed the additional space to work on the safe. This conclusion is directly contradicted by both Lucas' testimony and Richardson's statements to police. Lucas stated that the office was not so small that her presence would have prevented Richardson from opening the safe. Richardson stated to the police that his accomplice moved Lucas to the fan room "to shut her up" and made no statements concerning the size of the office. For these reasons, we hold that Lucas' movement and confinement were beyond that necessary to consummate the attempted especially aggravated robbery.

Having satisfied the first prong of the Dixon test, we now address the second prong. All three factors of the second prong of the Dixon test are implicated by the confinement of Lucas to the office and her movement to and confinement in the fan room. The confinement of Lucas in the office after she provided Richardson with the combination to the safe prevented her from summoning help and lessened Richardson's risk of detection. When Richardson moved Lucas from the office to the fan room, that additional movement prevented her from summoning help by moving her farther away from the stairway, which was her only avenue of escape. The location similarly lessened Richardson's risk of detection. The movement and confinement also created a significant danger to Lucas and increased her risk of harm. Lucas had sustained severe head injuries from the beating in the office, after which Richardson dragged Lucas to the fan room by her hair. Lucas was bleeding profusely and had an open head wound and a nearly severed finger. The confinement to the fan room increased her risk of harm by leaving these severe injuries untreated. For these reasons, the especially aggravated kidnapping conviction in reference to Lucas' movement and confinement does not violate due process.

Conclusion

The movement or confinement of both victims was clearly beyond that necessary to consummate the attempted especially aggravated robbery. The movement or confinement of the victims was intended to prevent them from summoning help, lessened the risk of the defendant's detection, and increased the victims' risk of harm. The especially aggravated kidnapping convictions therefore do not violate due process. Accordingly, we reverse the judgment of the Court of Criminal Appeals and reinstate the especially aggravated kidnapping convictions. The case is remanded to

8

the trial court to correct the judgments as necessary. It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

_____

JANICE M. HOLDER, JUSTICE