# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 3, 2010

## STATE OF TENNESSEE v. NICOLE SPATES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-05480     Paula Skahan, Judge**

---

**No. W2009-02437-CCA-R3-CD  - Filed April 25, 2011**

---

A Shelby County jury convicted the defendant, Nicole Spates, of aggravated robbery, a Class B felony, and especially aggravated kidnapping, a Class A felony.  The trial court sentenced her, as a Range I standard offender, to serve an effective twenty-year sentence in the Tennessee Department of Correction.  On appeal, the defendant argues that: (1) the evidence at trial was insufficient to convict her of especially aggravated kidnapping; (2) the dual convictions for especially aggravated kidnapping and aggravated robbery violate the Due Process Clause of the Tennessee Constitution; (3) the trial judge erred by granting the state's request for a special jury instruction; and (4) her sentence is excessive, and the court misapplied enhancement factors.  After a thorough review of the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

Lauren Pasley-Ward, Memphis, Tennessee, for the appellant, Nicole Spates.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; William L. Gibbons, District Attorney General; and Pamela Fleming, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

A Shelby County grand jury indicted the defendant, Nicole Spates, for aggravated robbery and especially aggravated kidnapping. The court held the defendant's jury trial September 14-17, 2009. At trial, the parties presented the following evidence.

Moneeca Wells testified that in November 2007, she was an employee at the IHOP restaurant on the corner of Showcase Boulevard and South Perkins Road in Memphis, Tennessee. She was the manager and worked the third shift between the hours of 7:00 p.m. and 7:00 a.m. Wells recalled that on November 19, 2007, two women robbed her while she was working at IHOP.

Wells stated that she first encountered the two women who robbed the restaurant when they entered the restaurant around 6:00 a.m. and asked her to seat them. Wells said that seating them was unusual because

> [f]irst they tried to sit like by the employees['] door toward the office, and [she] told them they couldn't sit there, then they tried to get a little closer, and [she] actually told them they couldn't sit there because [she] was cleaning in that section and [she] put them . . . towards the back[,] and that's where they went on ahead and sat down.

She sat them at a table, told a server that the women were at the table, and continued cleaning. Wells said that both women were wearing hooded coats and pants, and one woman wore a burgundy hat. She also said that one woman wore a pink coat. Wells later identified the defendant as the woman in the pink coat and the co-defendant as the woman wearing the hat.

Wells again encountered the defendant and co-defendant after an employee told her that two women who used to work at IHOP were in the office and wanted to speak with her about employment. Wells went in the office but did not see anyone. She looked behind the door, and the defendant and co-defendant started to grab her and pull her into the office. Wells said that she was "trying to pull back because [she] knew something then," but they pulled her into the office.

When they pulled her into the office, the women grabbed Wells, threw her on a table, shoved her to the floor, and pushed her under a desk. She stated that the co-defendant had a knife, and the defendant had mace. Wells was unsure, but she thought the co-defendant threw her on the table. She said that the co-defendant pulled her under the desk, told her to "stay under there and don't look,"and threatened her. The women asked Wells for the code to unlock the bottom safe, and she initially told them that she did not know it. The women continued to ask for it, and she finally gave them the code. They also asked for the code to

the top safe, which she did not know. After Wells told them the code to the bottom safe, the defendant took the money from the safe. According to Wells, the co-defendant held a knife to her stomach the entire time and told Wells that if she moved she would stab her in her stomach. Wells was visibly pregnant and told the women that she was pregnant. She said they responded that "they didn't care about [her] baby," and the defendant "kept telling [the co-defendant] to stick [Wells] in the stomach."

After they retrieved the money from the safe, the defendant and co-defendant looked for the video surveillance tape. They asked Wells whether there was a videotape, and she told them there was not. The women continued to look for the recording during which time the co-defendant told Wells that her boyfriend was a killer and that he would come back and kill her if she reported the robbery. The co-defendant told Wells to "look at her face, recognize her face and all that." The co-defendant also asked Wells for her phone number and address. Wells stated that the defendant did not say anything to her while the co-defendant was threatening her; however, the defendant was telling the co-defendant what to do. The women continued to search for the surveillance video by checking the computer disk drive. Wells said that they "pulled something out [of] the back of the computer, unhooked it, and that's what . . . [turned] the cameras off . . . ."

Once they unhooked the surveillance equipment, the defendant and co-defendant covered Wells's mouth with duct tape. The women also tied her hands with a rope that looked like an "old . . . jump rope." Wells freed herself from the rope, and as she was doing so, another manager entered the office. She could not remember whether he entered on his own or she opened the door for him. When he entered the office, Wells was sitting on the floor, and she told him that the women had robbed her. Wells testified that there was $1000 in the safe. She knew how much money was in the safe because it was her responsibility as the manager to know how much money the safe contained. Someone called the police, and when they arrived, Wells told them everything that had happened.

After she spoke with the police, Wells went home. She stated that she was unable to return to work at IHOP because she had to go to the hospital due to stress from the robbery. Wells stayed in the hospital for one day, and her physician placed her on bed rest for two weeks. A couple of days after the robbery, Wells viewed photospreads prepared by the police department. Wells identified the "advice to witness viewing photographic display" form that she had signed and the photospread from which she identified the defendant and wrote "[the defendant] worked at IHOP" and "telling her to stab me." The state entered both documents into evidence.

Wells said that the defendant had worked at IHOP for about one year. She also said that she and the defendant worked different shifts. It had been a couple of months between

the time the defendant stopped working at IHOP and when she robbed the restaurant. Wells neither recognized the defendant when they grabbed her upon entering the office nor did she recognize the defendant's voice when she was speaking during the robbery. She recognized the defendant from watching the surveillance video.

Wells identified another "advice to witness viewing photographic display form" that she had signed and the photospread from which she identified the co-defendant. The state entered both documents into evidence. Wells said that when she identified the co-defendant on the photospread, she wrote "she had the knife, threw me on the floor, threatened me not to tell or they will kill me" on it.

Wells said that she had seen the co-defendant eating at IHOP with the defendant a couple of times but did not know her personally. She said that she only knew her "by seeing her come in [IHOP] and eat." Wells did not recognize the co-defendant during the robbery.

Wells identified the CDs on which cameras recorded the surveillance videos of the restaurant before and during the robbery. The state played the videos for the jury, and Wells described what the videos showed for the jury. During the first CD, Wells described the front entry of the IHOP restaurant and pointed out where she was before the robbery occurred. Next, she identified the defendant and co-defendant when they entered the restaurant. She also identified the cook who was working that night, Cornelius Woods. As the video played, Wells described how the defendant and co-defendant tried to sit in two different places and how the defendant was wearing a hood and had her hands covered the entire time. Later in the video, Wells pointed out the defendant and co-defendant going toward the back of the restaurant.

The next CD showed the surveillance video of the office. Wells identified the defendant and co-defendant in the video and said that they were pointing toward the area where the disk drive was. She surmised that they were "probably trying to see how to unhook the camera." The video next showed Wells entering the office, looking behind the door, and the defendant and co-defendant attacking her and robbing the restaurant as Wells had previously described. Wells said that she could not get up from the ground while they were robbing her because the defendant and co-defendant threatened her life, she was pregnant, and they had a knife pointed toward her.

On cross-examination, Wells testified that at the time of the robbery, there were two tables with customers, three cooks, two servers, and herself in the restaurant besides the defendant and co-defendant. She said that Woods entered the restaurant after the defendant and co-defendant and went to the cook line. She stated that there were "[c]ameras all over the restaurant," and she would have seen where the defendant and co-defendant were if they

moved from the entrance. Wells reviewed the surveillance video again and pointed out where the women attempted to sit toward the back of the restaurant.

Wells recalled that Jennifer Hoff, an investigator hired by the defendant's attorney came to her home to speak with her about the robbery. She said that they spoke for "thirty or forty-five minutes." Wells agreed to give her statement to Hoff. She did not remember telling Hoff that someone else seated the defendant and the co-defendant the morning of the robbery. Wells stated that she recalled the name Latoya Heard and said she was a server at IHOP. She explained that another server got the defendant and co-defendant's beverage order, but Heard brought them their drinks.

Wells further stated that she could only remember a few things that she had discussed with Hoff. Wells remembered telling Hoff that she went to the hospital and stayed half the day there. She also remembered telling Hoff that she had given a statement to the police the day of the robbery. She also said that she told Hoff that the defendant and co-defendant put duct tape on her mouth.

On redirect examination, Wells testified that when she answered that she did not remember during cross-examination, she meant that she did not remember a particular question. Wells said that when Hoff visited her, she told her "basically" the same thing that she told the court, what she saw in the surveillance video, and what she told the police in her statement. Wells stated that when she thinks about the robbery her mind goes to "when they had the knife to [her] stomach threatening [her]." She further stated that she was 100 percent sure that she sat the defendant and co-defendant at their table on the morning of the robbery. Wells thought that she went to the hospital before she identified the defendant and co-defendant on the photospreads. She was on bed rest when she went to the police station to identify the defendant and co-defendant, and she stated that her mother accompanied her because she "didn't feel safe."

Wells stated that her testimony was true and the robbery happened as she had told the court. She further stated that the surveillance video came from IHOP and was accurate. She did not know how to "doctor" or create a video.

On recross-examination, Wells stated that she did not know how to operate the computer system that controlled the security cameras. She estimated that the incident in her office lasted fifteen to twenty minutes because the defendant and co-defendant were looking for the video surveillance equipment "for a minute."

While watching the surveillance video, Wells testified, on re-redirect examination, that the defendant and co-defendant entered the restaurant at 6:12 a.m. The video showed

her seating them at their table at 6:13 a.m. and her under the desk in the office at 6:34 a.m. The video also showed that the defendant had finished getting the money out of the safe at 6:36 a.m. Wells did not keep track of time during the robbery because she was not wearing a watch, and her phone was in her pocket. The surveillance recording ended at 6:40 a.m., and Wells estimated that she was under the desk for about two minutes after that.

Cornelius Woods testified that he was working as a cook at the IHOP on Showcase Boulevard in Memphis, Tennessee, on November 19, 2007. He stated that he arrived at work around 5:50 a.m. He further stated that there was a robbery at the restaurant that day, and he had contact with the people who robbed the restaurant.

Woods testified that when he arrived at work that morning, someone dropped off two women at the restaurant. Woods went to the lobby to get coffee, and the women whom he had seen called him over to their table. The women began asking him questions, and he answered them. He stated that he did not know the women and thought it was unusual for them to call him over and ask questions. He said that he "thought that they were actually just flirting . . . [s]o [he] went over there to see what they wanted[.]" He said the women also asked him whether the restaurant was hiring and where the manager was. Woods pointed out Wells to the women and told them that he would introduce them to her. The women also asked whether Moe, another manager at IHOP, was working that morning, and Woods told them that he was not there at the time. He said the women next asked about the district manager, Scott, who was not working at that time. Woods explained that the women did not ask for Scott by name, but "they asked about the salt and pepper hair guy." He said that he asked the women if they wanted to speak with the manager, and they said no and said, "we don't need her. [We] [a]lready know who she is." They told him that they just wanted to know who the manager was and whether the restaurant was hiring.

According to Woods, the women initially sat at a table near the office. He said that the restaurant did not allow customers to sit there; however, employees could sit there during breaks and when they were giving someone an interview. He said that when they called him over to the table, they had moved to a table on the other side of the restaurant.

Woods identified the copy of the surveillance recording that he had initialed after he reviewed it with the prosecutor. The state played the video for the jury while Woods narrated it. The video showed the women with hoods over their heads, which Woods said was unusual. He said that before that day, he had not seen the women before.

On cross-examination, Woods testified that he been working at IHOP for about seven months before the robbery. His schedule varied, and he did not always work on the day shift. He worked with different people but said that he never worked with either of the two women

whom he saw the morning of the robbery. Woods said that there was "probably about a good ten or fifteen minutes" between when he saw the women sitting at different tables. Woods stated that he saw the women's faces when they talked to him, but he "didn't try to . . . remember their faces at all." He further stated that he was not at the table long. The women did not surprise Woods by asking him so many questions about the managers at the restaurant because it was "early in the morning, [and] they could [have been] coming to get applications." He said that "the only thing that seemed weird to [him] was the hoods."

Woods testified that he was working in the kitchen when the robbery occurred and did not hear or see anything. He did not learn of the robbery until Wells and other employees told him. After they told him about the robbery, he "walked around . . . and checked out . . . what was going on." After he did that, he went back to work because he had orders to prepare. He did not see the police enter the restaurant, and they did not question him the day of the robbery. However, Woods stated the next day the police came to the restaurant and asked him a few questions. They asked him if he could go to the police station with them, and he went and gave his statement. Woods could remember neither whether he signed a statement nor whether he wrote anything. He did remember the police officers writing while he talked to them.

On redirect examination, the state refreshed Woods's memory with a copy of his police statement. Woods recognized the statement and said that he initialed it. He stated that the statement contained the same information that he had testified about. According to Woods, Wells appeared "hysterical, scared, and frightened" after the robbery.

On recross-examination, Woods agreed that the police took his statement on November 23, which was five days after the robbery. Woods said that he described the women to the police officers at the time of his statement, but he could not recognize them at the time he testified.

Michael Rosario, a detective with the Memphis Police Department Robbery Bureau, testified that he photographed the defendant. He stated that he photographed her because the clothing she was wearing "was very distinctive." He said that she was wearing a "pink jacket . . . with fur around the hood." Detective Rosario "had seen pictures that were sent out via e-mail to other robbery investigators, and throughout the whole department, with a . . . young woman that had committed a robbery of a business [who] was wearing that same clothing." He identified the stills from the digital video that the Safe Streets Task Force had sent, and the state entered them into evidence. He also identified the photographs of the defendant that he had taken, and the state entered them into evidence. Detective Rosario identified the defendant in the courtroom.

Detective Rosario described the photographs, which showed the defendant inside the managers office at IHOP and wearing "the pink jacket with the furry hood,"for the jury. Detective Rosario compared the jacket that the defendant was wearing when she came into his office with the jacket in the photographs and said that "[i]t appeared to be the same in every fashion. The fact that [it was] a bubble coat with a furry hood." He further said that she was not wearing the hood when she came to his office, but he had her "put it up for comparison's sake." Detective Rosario also described the photographs that he had taken of the defendant in his office for the jury.

On cross-examination, Detective Rosario testified that the jacket the defendant wore to his office was recognizable because the surveillance video showed "a young female black, light skinned, wearing a pink jacket with a furry hood, and . . . [they] had a young, light skinned, female black wearing the same jacket with a furry hood."

Sergeant Kevin Lundy, with the Memphis Police Department Homicide Bureau, testified that he was working with the Safe Streets Task Force in November 2007. He was the case officer who investigated November 19, 2007, robbery of the IHOP on Showcase Boulevard. As the case officer, he was responsible for "reviewing the case, the facts of the case, the information, delegating additional duties, gathering evidence, taking statements, [and] whatever need[ed] to be done."

For the IHOP robbery, Sergeant Lundy went to IHOP, met with the manager, and reviewed the surveillance video. He obtained copies of the videos from every camera angle, made still photographs from them, and distributed them to the media and various police agencies. He also "put out a broadcast, researched other reports[,] and things of that nature." Sergeant Lundy contacted Woods on November 23 when he went to IHOP and later that day when he took Woods's statement at the police station.

Sergeant Lundy identified the defendant and said that he contacted her after Detective Rosario told him that she was "on the forty-eight-hour hold in the robbery office and that she matched the description from the broadcast . . . and the information that [he] had sent out." Sergeant Lundy said that the defendant was in custody when he spoke with her, and he advised her of her *Miranda* rights before he started the conversation. He identified the advice of rights form that he presented the defendant on November 23, which was the same day that he spoke with her. The defendant agreed to speak with Sergeant Lundy, and Sergeant Lundy said that he was confident that the defendant understood her rights before he spoke with her. Sergeant Lundy reduced the conversation that he had with the defendant to a written statement, and he identified the statement for the court. The state entered the defendant's statement into evidence.

Sergeant Lundy read the defendant's statement aloud starting with where he explained her *Miranda* rights to her. In her statement, the defendant said that she and the co-defendant participated in the robbery of an IHOP on November 19, 2007. She stated that she was wearing a "[p]ink coat, blue jeans, white shoes, and a pink shirt," and the co-defendant was wearing "a brown coat, a red hat, some red pants, . . . white and pink Nikes, and a red and pink shirt." The defendant told Sergeant Lundy that she had pepper spray and a knife. She further told him that they took $976.67 during the robbery, and she received $120 of it. The defendant said that someone in "a white Crown Vic with some big rims and a silver trim" dropped them off at the restaurant, and they used a burgundy Buick that "an old man was driving" during the robbery.

When Sergeant Lundy asked the defendant about the events leading up to the robbery she answered

> Sunday morning [the co-defendant] came over to my house saying that she had a plan to rob IHOP. I said okay. We went in my room and we talked about it. Later on during the day we went to South Memphis, over to my momma's house. [The co-defendant] said she wanted to take my granddaddy's car because his car cranks up with a screwdriver. The day went by and we waited until it was time and we talked about it. We were going to get my stepdaddy's truck, but his headlights were out. So, we started walking and that is when we saw the friend in the white car. We were on Lauderdale at the time. . . . We left with him and we told [him to take us to] IHOP and he asked for what, and we did not tell him . . . why, and he dropped us off anyhow. We went inside and the plan was to sit by the backdoor where the office is and where they wash dishes. But we had to sit by the window by Taco Bell. The manager sat us down. But we did not know that [she] was the manager. [The server] came and took our drink order and that is when [the co-defendant asked] the black dude with the braids that worked there, . . . don't you remember me from Alcy Duplexes, and he said, no. He had to get back to work. [The co-defendant] said, hold on, wait a minute, come here, she said. Where's you all's manager. And he said in the back. She wanted to know if they were hiring or not. Then the server came back to take our food order and she left. [The co-defendant] said, come on. Let's go do it. We went to the back and I put my scarf over my face and went into the office. The manager wasn't in there but she came in. She tried to run back out, but we snatched her back in. [The co-defendant] threw her on the table and I pepper sprayed her. [The co-defendant] asked the girl what was the code. She said, I don't know the top code, I know the bottom code. She gave us the code, but first she said it too fast. So [the co-defendant] said . . . slow down, B***h. She can't hear you. I opened the safe

and got the money and said this is it? She told [me] that was it. So, [the co-defendant] said, where's the tape? That is when I had the knife. I told her I wanted the tape and [the co-defendant] told her, we are not going to hurt you. Time going by and [I] am telling her to come on and she is still looking for the tape. So, that is when I asked her for the address and she didn't have a home. [The co-defendant] said what is your number? And she gave her the number and that's when [the co-defendant] said, B****, I'm a robber and my n***** is a killer. B**** if you say anything my n***** will kill you. She said . . . I'm not, and [the co-defendant] put some duct tape over her mouth. We ran out and ran to the right towards Citgo and we saw this man and we just hopped in the car with him. [The co-defendant] told the man that her and her boyfriend got to fighting and she was trying to get away from him. The man told us he could not drop us off on South Parkway but he could drop us off close by. We were riding and [he] ended up dropping us off at [the co-defendant's] house in College Park. We went in the house and we couldn't count the money then because the dude that stays [there] was there. We waited until he left and we counted the money. Come to find out it was $967.67. [The co-defendant] called Carol, which is Chris's sister, and told her she had seven hundred dollars on Chris's bond[1]. She took it to her and I stayed in the apartment with the baby. Like an hour later, the rest of it was change, I got this boy named Drake to take us to Kroger on Third to the Coinstar, and we cashed in the coins. We got back to the house and we got some weed to smoke.

The defendant told Sergeant Lundy that the co-defendant passed her some gloves under the table at the restaurant. She said that she opened the tray where the surveillance CD was, but there was nothing in there. She also told him that she participated in the robbery because she was "[d]umb, weak minded, and because [the co-defendant] was [her] cousin." Sergeant Lundy said that the defendant read her statement, signed it, and put the date and time on it. He identified a photo of the co-defendant's driver's license on which the defendant "Rochelle Bush. I help[ed] her rob[] IHOP on Perkins on Monday morning around 6:30 [a.m.]"

Sergeant Lundy spoke with Wells the evening of November 23 after he had spoken with Woods and the defendant. He identified the photospreads he created that contained photographs of the defendant and co-defendant. He stated that he showed the photospreads to Wells; however, he did not show them to Woods because he did not have any suspects to place on a photospread when he talked to him. He said that he did not have Woods return

_____

[1] The record does not explain who Carol or Chris are or their involvement in the case.

-10-

to identify the suspects on the photospread because he "didn't really see a need. [The defendant] had already confessed and said who . . . helped her and identified her, and then, the victim, also, identified both of them."

On cross-examination, Sergeant Lundy testified that when he interrogated suspects he followed procedures that the Memphis Police Department established. He stated that audio taping was not a part of the regular interrogation procedures. Sergeant Lundy said that he and Sergeant Poindexter began talking to the defendant at 4:47 p.m. when she signed an advice of rights form. He stated that"[n]inety-nine percent of the time," two investigators were present while they interviewed a suspect. He explained that the advice of rights form explained the suspects' rights, and to be sure that the suspects understood the form, he had them read it aloud to him. Sergeant Lundy said that he had never had a suspect say that he or she did not understand the advice of rights form. The defendant identified the co-defendant on the photospread at 5:02 p.m. When asked what happened between 4:47 p.m. and 5:02 p.m., Sergeant Lundy answered, "I guess she was ready to talk to me. We [were] talking about what she was up there in the office for." He also said that during that time, the officers were interviewing the defendant so that she could tell her side of the story, and they were taking notes so that they could formulate questions. Sergeant Lundy "officially started taking the [defendant's] statement" at 5:21 p.m. He stated that officially taking the statement meant that they had "already talked about the alleged instrument, and [the defendant was] prepared to reduce that to writing . . . ." He further stated that he asked the defendant questions and typed her answers verbatim. He stated that he finished taking the defendant's statement at 8:09 p.m. Sergeant Lundy did not know why it took almost three hours to take the defendant's statement. He said that if a suspect did not give a statement or did not sign his or her statement, the officers returned him or her to jail, and continued the investigation.

After hearing the evidence, the jury convicted the defendant of aggravated robbery and especially aggravated kidnapping. On October 13, 2009, the trial court sentenced the defendant, as a Range I standard offender, to serve twenty years for the especially aggravated kidnapping and ten years for the aggravated robbery. The court ordered the defendant to serve her sentences concurrently for an effective twenty-year sentence in the Tennessee Department of Correction.

**Analysis**

On appeal, the defendant argues that: (1) the evidence at trial was insufficient to convict her of especially aggravated kidnapping; (2) the dual convictions for especially aggravated kidnapping and aggravated robbery violate the Due Process Clause of the Tennessee Constitution; (3) the trial judge erred by granting the state's request for a special

jury instruction; and (4) her sentence is excessive, and the court misapplied enhancement factors.

### 1. Sufficiency of Evidence

The defendant first argues that the evidence presented at trial was insufficient to sustain her conviction for especially aggravated kidnapping. The defendant contends that, besides the defendant's admission that she and the co-defendant threatened Wells to get the video and codes to the safes and the co-defendant's placing duct tape on Wells's mouth, no other evidence justified a finding of substantial interference with Wells.

It is well-established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

To sustain the defendant's conviction for especially aggravated kidnapping, the state was required to prove beyond a reasonable doubt that the defendant falsely imprisoned the victim either (1) by use of a deadly weapon or an article fashioned to lead the victim to reasonably believe it to be a deadly weapon; (2) when the victim was under thirteen years old; (3) where committed to holding the victim for ransom, as a shield, or as a hostage; or (4) where the victim suffered serious bodily injury. Tenn. Code Ann. § 39-13-305(a). False imprisonment is knowingly remov[ing] or confin[ing] another unlawfully so as to interfere substantially with the other's liberty. *Id.* § 39-13-302(a).

-12-

In this case, the evidence, viewed in the light most favorable to the state, showed that the defendant confined Wells by pulling her into the office at IHOP and forcing her under a desk. The defendant and co-defendant told her to stay under the desk and held her at knife-point. After they had emptied the safe, they duct taped Wells's mouth and bound her hands with rope. It is immaterial that the confinement was brief and that they only moved her a few feet away. *See State v. Carvin Lamont Thomas,* No. M2002-01716-CCA-R3-CD, 2003 WL 21233512, at \*4 (Tenn. Crim. App., at Nashville, May 28, 2003). The facts are sufficient to show that the defendant, along with the co-defendant, knowingly confined Wells in the office at IHOP, and the defendant is not entitled to relief on this issue.

## *2. Due Process*

Having concluded that the evidence was sufficient to support the defendant's aggravated kidnapping conviction, we now address whether the defendant's dual convictions for especially aggravated kidnapping and aggravated robbery violate principles contained in the Tennessee Constitution. Specifically, the defendant argues that the detention and movement of Wells were necessary to commit the robbery and did not result in a separate offense.

The Tennessee Supreme Court, in *State v. Anthony*, held that dual convictions for kidnapping and an accompanying felony, which stemmed from the same criminal conduct, violated due process when "the confinement, movement, or detention [was] essentially incidental to the accompanying felony." 817 S.W.2d 299, 306 (Tenn. 1991), *abrogated by State v. Dixon*, 957 S.W.2d 532, 535 (Tenn. 1997), *as recognized in State v. Richardson*, 251 S.W.3d 438, 443 (Tenn. 2008). Later, in place of *Anthony's* "essentially incidental" analysis, the supreme court formulated a two-prong analysis to determine whether the evidence supported a separate conviction for kidnapping. *See Dixon*, 957 S.W.2d at 535; *Richardson*, 251 S.W.3d at 443. First, we must inquire "whether the movement or confinement was beyond that necessary to consummate the act of [the accompanying felony]." *Dixon*, 957 S.W.2d at 535. This is a fact-intensive, threshold determination. *Richardso*n, 251 S.W.3d at 443. If the movement or confinement was beyond that necessary, then we must ask "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." *Dixon*, 957 S.W.2d at 535. If we answer the second prong in the affirmative, then the dual convictions for kidnapping and the accompanying felony do not violate principles of due process. *See Richardson*, 251 S.W.3d at 442-43. The determination of whether a separate kidnapping conviction violates due process principles is a question of law, which we review de novo with no presumption of correctness. *Richardson*, 251 S.W.3d at 442.

As for the first prong, we must decide whether the movement and confinement of Wells was beyond that necessary to consummate the aggravated robbery. Aggravated robbery, as pertinent to this case, is the intentional or knowing theft of property from the person of another accomplished by use of a deadly weapon. Tenn. Code Ann. §§ 39-13-401, -402. The evidence, viewed in the light most favorable to the state, showed that the defendant and co-defendant placed duct tape over Wells's mouth and bound her hands with rope after they had completed the robbery. The defendant argues that the confinement of Wells was "only [for the] purpose of obtaining money and the video." We disagree. Wells's testimony and the defendant's statement show that the women had already taken all of the money from the safe when they decided to confine her with duct tape and rope. Therefore, the defendant and co-defendant's confinement of Wells met the threshold determination of the *Dixon* test.

To pass constitutional muster, the separate kidnapping conviction must also meet the second part of the *Dixon* analysis. The second prong of the *Dixon* test requires us to determine "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." *Dixon,* 957 S.W.2d at 535.

Here, the defendant and co-defendant's confinement of Wells lessened their risk of detection. The defendant contends that because Wells freed herself shortly after they bound her, the "little restraints were not meant to prevent her from seeking help." Although Wells freed herself shortly after the defendant and co-defendant confined her, "it is the purpose of the removal or confinement and not the distance or duration that supplies a necessary element of aggravated kidnapping." *Id.* While the defendant and co-defendant were placing the duct tape over Wells's mouth and binding her hands with rope, the women asked for her personal information and warned her that if she said anything about the robbery they would kill her. Moreover, the defendant and co-defendant's confining Wells lessened their risk of detection. The defendant argues that the women trying to sit in two different sections, ordering food and drinks from two different servers, and talking to the cook showed "a lack of concern for detection." While the above maybe true, it fails to consider that the women also wore hoods so that they would be unrecognizable, and the women clearly spoke with the cook to learn about which manager was present at the restaurant in preparation for the robbery. After the defendant and co-defendant had robbed the restaurant and confined Wells, they were able to leave the restaurant, walk to Citgo, and get a ride home undetected. Having satisfied both prongs of the *Dixon* test, we conclude that the defendant's dual convictions for especially aggravated kidnapping and aggravated robbery did not violate her due process rights. She is without relief as to this issue.

*3. Jury Instruction*

-14-

Next, the defendant argues that the "trial judge erred in granting the State's special request for jury instruction that 'removal does not require a particular distance of removal, confinement does not require any particular duration or place of confinement.'" According to the defendant, this instruction was an improper comment upon the evidence in violation of Article Six, section 9 of the Tennessee Constitution. She further argues that the instruction was "a misstatement of the law when taken out of context and isolated from the statutory requirement that the jury determine whether any confinement or movement 'substantially' interfered with the victim; and contradicted or conflicted with the court's instruction requiring such 'substantial' interference."

In criminal cases, a trial court has an obligation to instruct the jury fully on the general principles of law that are relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)*; State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). To satisfy the defendant's constitutional right to a trial by jury, a "clear and distinct exposition of the law" is necessary. *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (*quoting State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987)). Questions concerning the propriety of jury instructions are mixed questions of law and fact, and thus our standard of review is *de novo*, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

In general, "a defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *superseded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247 (Tenn. 2002). On appeal, when determining whether jury instructions are erroneous, this court should "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994), *abrogated by State v. Saylor*, 117 S.W.3d 239 (Tenn. 2003)). In evaluating claims of error in jury instructions, courts must remember that "'[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning.'" *State v. Vann*, 976 S.W.2d 93, 101 (quoting *Boyde v. California*, 494 U.S. 370, 380-381 (1990)). A jury instruction is prejudicially erroneous "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id*. (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). Even if a trial court errs when instructing the jury, such instructional error may be found harmless. *State v. Williams*, 977 S.W.2d 101, 104 (Tenn. 1998).

The portion of the jury charge of which the defendant complains corresponds with applicable law. The Tennessee Supreme Court, in *Dixon*, determined that the aggravated kidnapping statute did not require "a particular distance of removal" or "any particular duration or place of confinement." 957 S.W.2d at 535. Looking at the trial court's

instructions, it is our view that the trial court was simply providing the jury with a clear, complete, and correct statement of the law. The jury instructions in this case fairly defined the issues and did not mislead the jury. The defendant asserts that "there is a reasonable probability that the jury never even considered whether the movement or confinement 'substantially' interfered with the victim[;]" however, the trial court charged the jury with the elements of the offense, including "that the defendant knowingly removed or confined another unlawfully so as to interfere substantially with the other's liberty." The jury is presumed to follow the instructions of the court. *See State v. Banks,* 271 S.W.3d 90, 134 (Tenn. 2008) (citations omitted). Accordingly, we conclude that the trial court did not err by instructing the jury that removal does not require a particular distance of removal and that confinement does not require any particular duration or place of confinement. This issue is without merit.

## 4. Sentencing

Finally, the defendant argues that her sentence is excessive and that the trial judge misapplied enhancement factors. The defendant specifically argues that the trial court erred in applying two of the four enhancement factors that it considered.

When an accused challenges the length and manner of service of a sentence, this court conducts a *de novo* review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401. This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely *de novo* without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with our sentencing statutes, and (2) the trial court's findings are adequately supported by the record. *See State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001); *see also* Tenn. Code Ann. § 40-35-210(f).

The burden is upon the appealing party to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. In conducting our review, we are required, pursuant to Tennessee Code Annotated section 40-35-210, to consider the following factors in sentencing:

> (1) [t]he evidence, if any, received at the trial and the sentencing hearing; (2)[t]he presentence report; (3)[t]he principles of sentencing and arguments as to sentencing alternatives; (4)[t]he nature and characteristics of the criminal conduct involved; (5)[e]vidence and information offered by the parties on the

enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and (6)[a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

Prior to 2005, the Sentencing Act set forth a "presumptive sentence" to be imposed within the applicable range: the minimum sentence for all felonies other than Class A felonies, and the midpoint sentence for Class A felonies. *Id*. § 40-35-210 (c) (2003). Pursuant to the 2005 amendments, our Sentencing Act has abandoned the statutory minimum sentence and renders enhancement and mitigating factors advisory only. *See id*. §§ 40-35-114,-35-210 (c). The 2005 amendments set forth certain "advisory sentencing guidelines" which the trial court is required to consider but is not bound by. *See id*. § 40-35-210(c). Although the application of factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id*. § 40-35-210(b)(5). The trial court is also required to place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." *Id*. § 40-35-210(d). If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after giving due consideration and proper weight to the factors and principles set out under sentencing law, and the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. *State v. Hooper*, 29 S.W.3d 1, 5 (Tenn. 2000).

Because the record indicates that the trial court considered the sentencing principles and all relevant facts and circumstances, we review the trial court's ruling *de novo* with a presumption of correctness. *Pettus*, 986 S.W.2d at 543-44. Here, the trial court found the following enhancement factors applicable to both of the defendant's sentences:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;
(4) A victim of the offense was particularly vulnerable because of age or physical or mental disability;
. . . .
(10) The defendant had no hesitation about committing a crime when the risk to human life was high;
. . . .
(16) The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult[.]

Tenn. Code Ann. § 40-35-114. The defendant argues that the court erred when it applied factors (4) and (10) to her sentence.

Regarding factor (4), that the victim was particularly vulnerable because of age or physical or mental disability, the trial court relied on Wells's pregnancy and that she was a petite woman to support this factor. The defendant argues that the state did not introduce any proof that showed that Wells's pregnancy, sex, or stature rendered her particularly vulnerable. We agree with the defendant. The state did not introduce sufficient proof in this case to establish that the pregnant victim was "particularly vulnerable because of age or physical or mental disability." In *State v. Adams*, the Tennessee Supreme Court held that

> the vulnerability enhancement relates more to the natural physical and mental limitations of the victim than merely to the victim's age. . . . The factor can be used . . . if the circumstances show that the victim, because of [her] age or physical or mental condition, was in fact "particularly vulnerable," i.e., incapable of resisting, summoning help, or testifying against the perpetrator.

864 S.W.2d 31, 35 (Tenn.1993). The state has the burden of proving that the victim's limitations rendered her particularly vulnerable. "The fact of the victim's pregnancy does not, in and of itself, establish that the victim was 'particularly vulnerable' to the robbery.'" *State v. Cockrill*, M2002-00761-CCA-R3CD, 2003 WL 1787287 at *3 (Tenn. Crim. App., at Nashville, Apr. 4, 2003). Wells was able to fight back against the defendants, was able to free herself and summon help, and testify against the defendant. In short, the state failed to adduce any proof that the victim's pregnancy affected the victim in connection with the crime, and the trial court, therefore, erred in applying this enhancement factor to the defendant's sentence for this robbery.

We further conclude that the evidence was sufficient to support the trial court's application of enhancement factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high. This court has previously upheld a trial court's application of enhancement factor (10) when the victim was pregnant and risk was to the viability of the fetus's life as well as the victim's. *State v. Guzman-Chavez*, M2006-01680-CCA-R3-CD, 2008 WL 992680, at *10 (Tenn. Crim. App., at Nashville Apr. 10, 2008); *State v. Melissa D. Hayman*. No. E2001-01600-CCA-R3-CD, 2002 WL 31126632, at *6 (Tenn. Crim. App., at Knoxville, Sept. 26, 2002). Although the risk to human life in the victim is inherent in offenses involving deadly weapons, the risk to an unborn fetus is not necessarily present in every especially aggravated kidnapping or aggravated robbery. *See Hayman*, 2002 WL 31126632 at *5-6. Here, the defendant and co-defendant used a knife while committing the robbery and held it to Wells's stomach to coerce her into complying with their demands. Accordingly, we conclude that the trial court properly applied this enhancement factor.

Although we conclude that the trial court improperly applied enhancement factor (4), we conclude that the error was harmless. The trial court properly applied the three remaining enhancement factors, and they were sufficient to justify the enhancement of the defendant's sentences. Accordingly we conclude that the defendant's sentence is proper, and the defendant is not entitled to relief on this issue.

## Conclusion

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____

J.C. McLIN, JUDGE